## A. B. TREADWELL *v.* WM. McKEON.

FRAUD. *Trusts. Appropriation of trust funds.* A third party who acquires the title to property by the illegal appropriation of trust funds, which illegal appropriation was known to and procured to be made by such third party, is affected with the trust just as the trustee would have been, and the beneficiary can elect either the property or his remedy in *personam.*

Case cited: Hamilton *v.* Brown, 3 Sneed, 465.

### FROM SHELBY.

Appeal from the Chancery Court. A. M. CAMP-BELL, Chancellor.

L. D. McKISSICK for complainant.

YERGER, SALE & MILLER for defendant.

NICHOLSON, C. J., delivered the opinion of the court.

In 1847, L. F. Henderson and W. McKeon, being judgment creditors of Michael Lougan, filed separate bills, in the Chancery Court at Memphis, to set aside a conveyance of a house and lot in Memphis, made by Lougan to Wm. Clark, upon the ground of fraud, and seeking to subject the lot to the satisfaction of their respective claims. The cases were consolidated, and on final hearing the conveyance was set aside as fraudulent, and the house and lot decreed to be sold. At the sale, which took place on the 20th of October, 1853, Wm. McKeon was the purchaser at $6,050,

who executed his two notes at six and twelve months, with E. M. Yerger, who was the solicitor of Henderson, as his surety. A lien was retained in the decree to secure the payment of the notes. On the 24th of December, 1855, a decree was rendered, in which it was recited that McKeon had paid $6,569, the purchase money and interest, and the title was vested in McKeon. A writ of possession was ordered to issue, and under the writ McKeon was put in possession on the 1st of April, 1856.

The proceeds of the lot were ordered to be paid over—to McKeon $1,666, and to Henderson $3,487, and the residue, $1,149, to be retained for further orders. An account for rent was ordered against Lougan from October 20, 1853, the date of sale, to April 1, 1856, when possession was given. Upon the report of the clerk and master, in June, 1856, a decree was rendered in favor of McKeon against Lougan for $1,838 for rents. The surplus of $1,149, or so much as remained after paying prior liens, was ordered to be credited on the decree.

In February, 1860, complainants, who are the only heirs and distributees of Henderson, filed the present bill, in the Chancery Court at Memphis, against McKeon, to have a resulting trust declared and set up in the house and lot purchased by him, to the extent of the judgment of $3,487, upon the allegation that under an agreement between McKeon and Henderson, their respective judgments were satisfied by being appropriated in payment for the house and lot, and that the title was vested in McKeon, and held by him in

trust for Henderson and himself. McKeon denies, in his answer, that he bought the lot upon any agreement with Henderson, or with any other person on behalf of Henderson, that Henderson was to be interested in the lot to the amount of his judgment, or that he took title under any such agreement. He states "that after the sale he proposed to E. M. Yerger, Esq., that he might become jointly interested in the purchase if he desired; that Yerger told him he did not have the money, and that he had no authority to make the purchase for Henderson." Respondent then stated to said Yerger that he was pressed to get the money, and did not know that he could make the payment unless he could sell the lot, and authorized said Yerger to make a sale of it for him in cash, so as to pay the purchase money, and agreed to pay said Yerger one-half of all he could get over the amount bid by respondent. He is informed by said Yerger that he did try to sell and could not. He states, also, that he did not pay into court the amount of his own decree, nor of said decree of Henderson. He admits that said Yerger, as solicitor of said Henderson, gave a receipt on the 31st of July, 1856, for the amount of the decree of said Henderson. As before stated, respondent was pressed for money and could not make the payments on his purchase, and he obtained the receipt from said Yerger upon the express agreement and understanding that he, said Yerger, might go on and sell said property, and out of the sale pay the decree of Henderson; and in no event was said property to be sold by said Mc-

Treadwell v. McKeon.

Keon without said decree being immediately paid out of the proceeds. McKeon states in his answer that on the 20th of October, 1853, which was the day of his purchase, he paid Yerger $700 on his fee of $1,000. It is observed that the decree vesting the title in McKeon was made in December, 1855, and the receipt of Yerger, referred to by McKeon, was dated in July, 1856. In reference to these matters, it was admitted of record by the parties that when the decree vesting the title was made, McKeon had not paid the amount of the Henderson decree; but it was before then "agreed that said E. M. Yerger, the solicitor of said Henderson, should receipt to the said McKeon for the same, as though he had been paid." This agreement, as well as the answer of McKeon, is signed by E. M. Yerger as his solicitor.

The deposition of E. M. Yerger was taken for defendant. He says: "I did not agree to join him (McKeon) in said purchase on the part of the plaintiff (Henderson), nor did I know that he was going to make it. He came to me afterwards and told me he had bought the house and lot, and had to pay the clerk for it, but did not have the money, and asked me to receipt to him for the payment, so that he could settle with the clerk and get the title, stating to me that I could sell the property at any time I pleased and could get a buyer, and pay the debt of Henderson. I agreed to do so, believing that the property would bring the money at any time, and did give the receipt. Defendant paid me $700, in part of my fee, at the time. As the attorney of

Henderson, I never made any agreement that the purchase should be joint, and I did not give the receipt to McKeon as a payment, but only to enable him to get the title, and so enable me to sell the property and get Henderson's money out of it. I never had authority to buy the land for Henderson, nor did he consent I should do so. So far as I know, Henderson never heard or knew of the purchase by McKeon. He told me I might have half of all I sold it for over and above what he gave for it. I never had any agreement with McKeon in writing that I was to sell the lot and pay the Henderson debt."

On cross-examination, Yerger said: "Henderson's decree went into the payment for the lot. The payments made to me by McKeon were without the knowledge of Henderson, and some of them, as appears by the agreement, were made after the death of Henderson."

It is manifest that the proof fails to support the allegation of the bill, that McKeon bought the lot in pursuance of an agreement between Henderson and himself that their respective judgments were to be used in paying for it. But it is equally manifest that the two judgments were so used, and that it was by this means that McKeon effectuated his purchase and procured the title to the lot. It is clear that McKeon appropriated Henderson's judgment, in pursuance of an agreement between Henderson's solicitor and himself, but it is not clear at what time this agreement was made. McKeon and Yerger both state that it was made after McKeon purchosed, but how

long afterwards is left in some doubt. Two facts, however, are distinctly stated, from which we infer that this agreement was made immediately after the purchase, and before McKeon executed his notes to the clerk. First, it is shown that Yerger was Mc-Keon's surety on the notes; and second, that on the day of sale—October 20, 1853—McKeon paid to Yerger $700 on his fee of $1,000. From these facts, which are clearly established, we think it altogether probable that when McKeon paid the $700, and procured Yerger to become his surety on the notes, and it was then understood and agreed that when the notes become due, which would be at the end of twelve months, if McKeon could not raise the money to pay them, that Yerger would give to him a receipt for Henderson's judgment, to enable him to procure the title. We infer that when McKeon found himself unable to pay at the maturity of the notes, which was in October, 1854, that the agreement was carried out by the decree of December 24, 1855, in which it is assumed that the purchase money was all paid, and was in court. This decree could only have been made upon the agreement of the parties that the money was paid, and of this decree Yerger was necessarily cognizant. But as a matter of fact, no money except the $700 paid to Yerger on the day of sale, had been paid, nor had Yerger then executed the receipt; this was not done until July 31, 1856, although it is admitted in the record that Yerger had agreed before the decree of December 24, 1855, that he would give such receipt.

Without being able to fix definitely upon the date of the agreement between McKeon and Yerger, we think the terms of the agreement show that, upon Yerger's receiving $700 on his fee, and his promise to give McKeon a receipt and thus to enable him to take up his notes and procure the title without paying the money, McKeon agreed that Yerger might sell the lot at any time for cash, and have one-half of the proceeds over and above the purchase price. We think it fairly inferable, from the proof, that Yerger accepted this proposition, and carried it out by making efforts to sell the lot, and in allowing the decree for title to be made, and in afterwards giving McKeon the promised receipt.

It follows that the proof fails to sustain the allegations of the bill as to the purchase of the lot under an agreement between McKeon and Henderson, and therefore that complainants are not entitled to the property as a resulting trust upon the grounds relied on in their bill. But if they are entitled to relief it must be given upon the case made in defendant's answer and the proof.

No principle of law is better settled than that, if a trustee or other person standing in a fiduciary relation, wrongfully converts a trust fund into another species of property, the beneficiary will be entitled to the property thus acquired. In such case the wrongful act of the trustee is not binding on the beneficiary, and is a matter entirely at the option of the latter whether to take the substituted property, or to disclaim title thereto and proceed upon his remedy *in*

*personam.*    *Hamilton* v. *Brown,* 3 Sneed, 465.    It is
not denied that Yerger occupied a fiduciary relation
to Henderson, and it is conceded that, as solicitor, he
had no power to appropriate Henderson's judgment, or
to receive satisfaction of it, without his consent, in
anything but money.    The assignment of the judg-
ment, or the acknowledgment of satisfaction of it,
therefore, without receiving the money, and the agree-
ment that it might be used by McKeon in procuring
title to the lot, was a misappropriation and conversion
of the trust fund, which was not binding on Hender-
son.    As soon as the converson took place and the
title to the lot was obtained, if the title had been
taken by Yerger, the right of Henderson to the lot,
at his election to his remedy *in' personam,* accrued.
But the title was not vested in Yerger, the solicitor,
but in McKeon, with Yerger's consent and by his
active procurement, and for the benefit of McKeon
directly, and contingently for the benefit of Yerger.
There is no pretense that McKeon was an innocent
purchaser.    For his own accommodation and benefit,
and contingently for the benefit of Yerger, McKeon
obtains the use of Henderson's judgment, and thereby
acquires title to the lot.

It is true that there seems to have been no pur-
pose, on the part of either Yerger or McKeon, to
defeat the ultimate collection of Henderson's judgment.
It was only an unauthorized and, in the eye of the
law, fraudulent appropriation of the judgment, for the
present and temporary accommodation and benefit of
McKeon, and incidentally for the benefit of Yerger.

In one event both were 'interested in the property. If Yerger could sell the lot for more than the purchase price, he was to have one-half of the excess after paying McKeon's and Henderson's judgments. It was a joint speculation of the parties on the trust fund, and so soon as the trust fund passed into the lot, the law substituted the lot for the judgment, and gave to Henderson the option to claim the property, or to proceed on his judgment, or to proceed against Yerger *in personam.*

The exact question here involved was decided by this court, at the present term, in the case of *Miller* v. *Birdsong,* in which it was held that a third party, who acquires the title to property by the illegal appropriation of trust funds, which illegal appropriation was known to and procured to be made by such third party, was affected with the trust just as the trustee would have been, and that the beneficiary could elect either the property or his remedy *in personam.*

Such we regard the present case; and, upon the same ground, we hold that McKeon holds the lot as trustee for Henderson, and his heirs having elected to claim the property, they are entitled to relief upon the case made in the answer and by the proof. The Chancellor so held, and we affirm his decree.

The costs of this court will be paid by McKeon.

---

In this case the decree of the Chancellor was affirmed. By that decree a reference was made to ascertain the amount reasonably due to Yerger for his

services as attorney, and the decree was affirmed, under the impression that the Chancellor had held that after the amount of the fee was ascertained it should be deducted from the amount of the Henderson judgment, and the balance would show the *pro tanto* interest of Henderson's heirs in the property, and its proceeds when sold.

This was the opinion of the court on this point, and the decree in this respect will be so modified, but in all other respects affirmed.