RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0026P (6th Cir.)
File Name: 02a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: WILLIAM DUNLAP
CANNON III,

          *Debtor.*

_____

GEORGE W. STEVENSON,
Trustee for William Dunlap
Cannon III,

    *Plaintiff-Appellant,*


    *v.*


J.C. BRADFORD & COMPANY;
J.C. BRADFORD FUTURES,
INC.; CHARLES ROSS,

    *Defendants-Appellees.*

Nos. 00-5624/5895

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
Nos. 99-02400; 99-02605—Julia S. Gibbons,
District Judge.

Argued: August 10, 2001

Decided and Filed: January 18, 2002

Before:  KEITH, KENNEDY, and BATCHELDER, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Michael P. Coury, WARING COX, PLC, Memphis, Tennessee, for Appellant.  William J. Nissen, SIDLEY & AUSTIN, Chicago, Illinois, for Appellees. **ON BRIEF:**  Michael P. Coury, Saul C. Belz, Quitman R. Ledyard, WARING COX, PLC, Memphis, Tennessee, for Appellant.  William J. Nissen, R. Rene Pengra, SIDLEY & AUSTIN, Chicago, Illinois, for Appellees.

_____

**OPINION**

_____

ALICE M. BATCHELDER, Circuit Judge.  In this opinion we address two separate appeals from judgments of the district court in an adversary proceeding commenced in the bankruptcy of William Dunlap Cannon III.  In the first (No. 00-5624), George W. Stevenson in his capacity as trustee of the estate in bankruptcy sought to avoid certain fraudulent transfers pursuant to 11 U.S.C. § 548 (the "core proceeding"). *See generally Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546 (Bankr. W.D. Tenn. 1999). Following a bench trial the bankruptcy court entered judgment in favor of the trustee for $1,137,500 plus prejudgment interest. *Id.* at 599-600. *See also Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 232 B.R. 701, 709 (Bankr. W.D. Tenn. 1999).  On appeal the district court ruled that the trustee had failed to establish that funds Cannon held in trust for clients constituted "an interest of the debtor in property" within the meaning of section 548(a) and reversed the judgment of the bankruptcy court.

In the second (No. 00-5895), the trustee asserted several claims under federal and state law against the defendants (the

Although Cannon could have brought suit against the Defendants in his capacity as the trustee of the escrow accounts had he not filed for bankruptcy, the bankruptcy code does not allow the trustee to collect money not owed to the estate. Because any recovery that the trustee might obtain in this adversary proceeding would benefit the clients Cannon defrauded, not the general creditors of the estate, the trustee lacks standing to proceed. Therefore, we affirm the judgment of the district court and reverse the judgment of the bankruptcy court.

"non-core proceeding"). After trial the bankruptcy court made proposed findings of fact and conclusions of law recommending that the district court enter judgment in favor of the trustee for $2,361,736 in compensatory damages, $5 million in punitive damages, prejudgment interest, and reasonable attorneys' fees and costs. *Stevenson*, 230 B.R. at 601; 232 B.R. at 708-09. The district court sustained the defendants' objection that the trustee lacked standing to bring the non-core proceeding because the debtor could not have brought suit against the defendants. Accordingly, the district court dismissed the non-core proceeding. Stevenson timely filed notices of appeal from both judgments of the district court, and we consolidated the appeals for purposes of oral argument. For the reasons that follow, we will affirm the judgments of the district court.

## I. Statement of Facts

William Dunlap Cannon III practiced law in Memphis, Tennessee, for over twenty years before filing for bankruptcy in February 1994. Cannon's practice consisted almost entirely of real estate closings, and during the time periods relevant to this suit he averaged between 120 and 150 closings per month. Cannon maintained several escrow accounts to hold clients' funds deposited in connection with real estate transactions. His principal escrow account was at United American Bank ("UAB") and titled "William Dunlap Cannon III—Real Estate Escrow Account II." Cannon also maintained at least two similarly titled escrow accounts with First Tennessee Bank ("First Tennessee"). As a result of the volume of Cannon's closings, between $5 million and $10 million per month flowed through these accounts. Cannon understood that he was a fiduciary with respect to the funds deposited in escrow and that the accounts served the sole purpose of receiving and disbursing funds in connection with real estate transactions. As a matter of practice, Cannon collected his legal fees earned in connection with closings by depositing checks drawn on the escrow accounts into his law office's separate account maintained at First Tennessee.

By the mid-1980s, Cannon had begun to use funds in his escrow accounts to pay various personal and business expenses. Initially, Cannon misappropriated the "float" in the escrow accounts.[1] By the Fall of 1986, the escrow accounts had a deficiency of approximately $400,000 to $500,000; but, the size of the float generated by the volume of Cannon's real estate closing business concealed the shortfall.

In October 1986 Cannon opened a brokerage account with J.C. Bradford Futures, Inc., a wholly owned subsidiary of J.C. Bradford & Co. (collectively "Bradford"), to trade commodity futures. Prior to opening his account with Bradford, Cannon met with Charles Ross, the head of Bradford's Memphis office, and Freddie Norman, who discussed with Cannon a system the two had developed while at Merrill Lynch for forecasting trends in commodities markets and timing trades. At their meeting Ross and Norman explained their system, showed Cannon an impressive hypothetical annual rate of return of 100% to 200%, advised Cannon to take every trade recommended by the system, and informed Cannon that he might incur substantial short-term losses that he could readily recoup by sticking with the system for a long period of time.

On the basis of these representations, Cannon opened an account and gave Ross and Norman discretion to enter into commodities transactions within the parameters recommended by the system. Cannon's application for the Bradford commodity account shows that Cannon had an annual income of more than $250,000 and a net worth, excluding the value of his home, of between $500,000 and $1 million. It also reveals that Cannon had no prior experience in trading commodities. Although Bradford had a policy of not accepting corporate checks, the record reflects that all of

---

[1] "Float" refers to the artificial balance created due to delays in processing credits and debits to an account. *See United States v. Stone*, 954 F.2d 1187, 1188 n.1 (6th Cir. 1992). *See also* BLACK'S LAW DICTIONARY 640 (6th ed. 1990) (defining "float" as "[t]he delay in processing transactions by banks and others which may permit the interest-free use of funds for brief periods").

debtor's accountant because under Connecticut law those claims belonged to investors); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) (holding that the trustee had standing to pursue an action for churning against the debtor's broker relating to transactions in a discretionary account, but did not have standing to bring a suit for fraud since that cause of action accrued to creditors under New York law); *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979 (11th Cir. 1990) (concluding that the trustee of a corporate debtor that defrauded its customers did not have standing to pursue an action for fraud against a broker because the claims belonged to the defrauded customer creditors). While none of these cases involves a situation in which the third party sued by the bankruptcy trustee participated in or committed an independent wrong against trust property managed by the fiduciary of an express trust, they all demonstrate the limits the bankruptcy code places on the power of the trustee to collect money not owed to the estate. Because the code precludes a recovery that benefits anyone other than the estate, the trustee lacks standing to maintain an adversary proceeding seeking such a recovery. We are mindful that our decision in this case might allow Defendants to profit from their fraud; but, the beneficiaries of the escrow accounts and the insurers to whom they are subrogated can pursue remedies in state court, and we are simply unwilling to set aside the settled principles of the law of trusts because of the result in a particular case.

## Conclusion

In the core proceeding (No. 00-5624), we hold that under section 548 Cannon had no "interest in the property" that would subject the funds held in escrow to the trustee's avoidance power. Under Tennessee law the escrow accounts constitute express trusts and so never entered the estate of the bankrupt. Therefore, we affirm the judgment of the district court and reverse the judgment of the bankruptcy court.

In the non-core proceeding (No. 00-5895), we hold that the trustee lacks standing to bring suit against Defendants.

*Harris Trust & Sav. Bank*, 530 U.S. at 252 (quoting RESTATEMENT (SECOND) OF TRUSTS § 294 cmt. c). *See also Terrell v. Terrell*, 292 S.W.2d 179, 296 (Tenn. 1956) ("A person may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining the benefit of, or shielding himself from the results of his own fraud[.]") (quoting 31 C.J.S. *Estoppel* § 75).

Although under this rule the bankruptcy trustee would have standing to pursue the causes of action asserted in the non-core proceeding because Cannon, had he not filed for bankruptcy, could have brought them notwithstanding Cannon's misappropriation of trust property, the presence of the express trust in this case complicates matters. Since Bradford did not accept the trust funds as a bona fide purchaser for value and without notice of Cannon's breach of trust, under general common-law principles the funds Cannon misappropriated remain subject to the express trust. *See, e.g.*, *Harris Trust & Sav. Bank*, 530 U.S. at 252 ("[W]hatever [the trustee] recovers he will hold subject to the trust."). Consequently, the trustee's recovery, if any, in this case will benefit Cannon's clients—not the general creditors of the estate. As we previously discussed, section 541 excludes from the debtor's estate property held in an express trust for another. *Begier*, 496 U.S. at 59. Therefore, any action brought by the trustee against Defendants would not bring property into the estate for the benefit of the creditors. Instead, such a suit would recover misappropriated trust property for Cannon's clients, the beneficiaries of the express trust who lost their money upon the collapse of his schemes. Accordingly, because the trustee asserts causes of action in the non-core proceeding alleging harm to the beneficiaries of the express trust, he lacks standing to maintain this suit against Defendants. *See In re Van Dresser Corp.*, 128 F.3d at 947.

We find support for our conclusion in several cases from the Second and Eleventh Circuits. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) (holding that a trustee had no standing to pursue claims of fraud against the

the checks that Cannon deposited into his brokerage account with Bradford came from one of his escrow accounts with UAB or First Tennessee.

By early 1987 Cannon's account had lost over 50% of the funds invested. After increasing the size of his positions, Cannon recovered these losses over the next two years. In September 1990 Cannon ceased trading in his Bradford commodity account. By this point in time, Cannon had realized a profit of $12,454, representing an annual rate of return of approximately 3.3%.

As losses from Cannon's business ventures and other investments mounted, the deficiency in the escrow accounts reached approximately $1.5 million by the Spring of 1992. Cannon could no longer rely on float to conceal the shortfall in the escrow accounts, so he began to take more aggressive measures. First, Cannon held closing checks to generate float.[2] As the deficiency increased and Cannon became increasingly dependent on new funds to cover the checks being held on prior closings, Cannon began kiting checks to increase the balance in the escrow accounts.[3] In addition to

---

[2]Part of Cannon's real estate closing practice involved forwarding checks deposited in escrow to pay off mortgage loans of property being sold. By delaying in forwarding a check to the holder of the mortgage being retired, Cannon created float in the escrow accounts, which he covered as new monies came into the accounts.

[3]We have given the following definition of check kiting:

Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank.

*Stone*, 954 F.2d at 1188 n.1. *See also* BLACK'S LAW DICTIONARY 871 (defining "kiting" as "consist[ing] of writing checks against a bank account where funds are insufficient to cover them, hoping that before they are presented the necessary funds will be deposited").

kiting between accounts with UAB and First Tennessee, Cannon opened accounts with several out-of-town banks.

Desperate for a way out of his predicament, Cannon resumed commodities trading in March 1992 based on representations that Ross and Norman had improved their system. As Cannon again sustained losses, he made margin calls and covered positions with checks drawn on the escrow accounts at UAB and First Tennessee. Cannon realized the impropriety and illegality of using the escrow accounts in this way, and he depended upon deposits from new closings to pay off the parties to earlier transactions. At various points when Cannon experienced large losses, Ross and other managers with Bradford sought explanations for Cannon's use of checks drawn on the escrow accounts, but never confirmed Cannon's verbal assurances that the accounts contained his own money, even though Cannon had previously indicated to Ross that he was trading with borrowed funds. By February 1994 Cannon had sustained gross trading losses of $2.36 million and net trading losses of more than $1 million. In turn, the losses increased the pressure on Cannon's practice to make up the deficit in the escrow accounts by delaying payments on closings and kiting checks. Cannon's trades generated brokerage commissions of $286,876 for Bradford.

Cannon's scheme came to an end when UAB informed Cannon on February 3, 1994, that it would no longer cover overdrafts, immediately credit his account upon presentation of a check, or transfer funds among his accounts. *See Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*, 21 F. Supp. 2d 785, 790-91 (W.D. Tenn. 1998) (stating the facts in a related civil case). Shortly thereafter Cannon bounced two checks at First Tennessee, which then returned all checks presented for payment on Cannon's accounts and terminated Cannon's accounts on February 17, 1994. *See First Tenn. Bank, N.A. v. Stevenson (In re Cannon)*, 237 F.3d 716, 718 (6th Cir. 2001) (stating the facts in a related case in which the trustee sought to avoid a preferential transfer). As a result of these actions, Cannon voluntarily suspended his license to practice law and filed a voluntary petition for bankruptcy

*Anderson*, 84 Tenn. (16 Lea) 310 (1886) (holding that a third party who receives trust property on inquiry notice that a trustee has misappropriated trust funds is also liable for breach of trust). On the facts presented, which indicate that all the checks Cannon deposited into his commodities account with Bradford came from the escrow accounts and clearly identified the source of the funds, Bradford cannot claim to have accepted the trust property without actual or constructive knowledge of Cannon's breach of his fiduciary duties. *Stevenson*, 230 B.R. at 593-94 (summarizing the evidence that Bradford knew or recklessly did not know that Cannon had appropriated funds from the escrow accounts to trade commodities).

Whether a third party commits an independent wrong against the trust or participates in the trustee's breach of fiduciary duty, a trustee who has committed a breach of trust can nonetheless pursue a cause of action against the third party, although in this circumstance the beneficiary may as well. *Harris Trust & Sav. Bank*, 530 U.S. at 252. *See also* RESTATEMENT (SECOND) OF TRUSTS § 294; BOGERT §§ 954 & 955.[6]

> Although the trustee bases his cause of action upon his own voluntary act, and even though the act was knowingly done in breach of his duty to the beneficiary, he is permitted to maintain the action, since the purpose of the action is to recover money or other property for the trust estate, and whatever he recovers he will hold subject to the trust.

---

[6] The beneficiary has two causes of action, one against the trustee and another against the third party, and should proceed by joining both in the same action. RESTATEMENT (SECOND) OF TRUSTS § 294 cmt. a; BOGERT § 871 & 955. Of course, whether the beneficiaries can under the circumstances of this case pursue a cause of action has no direct bearing on the standing of the bankruptcy trustee to sue Defendants. All that matters is whether the trustee can maintain a cause of action notwithstanding his own breach of fiduciary duty.

could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.* Therefore, if Cannon himself could have pursued the claims the trustee asserted against Defendants in the non-core proceeding, then the trustee has standing to maintain the non-core proceeding.

With regard to the law of trusts, Tennessee generally follows the common law. *See Mayfield v. First Nat'l Bank of Chattanooga, Tenn.*, 137 F.2d 1013, 1018-19 (6th Cir. 1943). *Cf. New Hampshire Ins. Co. v. Jones (In re Jones)*, 158 B.R. 731, 733 (Bankr. E.D. Tenn. 1993) (citing *Kopsombut Myint Buddhist Ctr.*, 728 S.W.2d at 333). Under the common law, a trustee can maintain an action in law or equity against a third person to remedy an injury with respect to trust property as if he held the property free of the trust; generally, beneficiaries of the trust cannot. *See, e.g.*, *Third Nat'l Co. v. Commerce Union Bank*, 181 S.W.2d 759, 512 (Tenn. 1944); *Louisville & Nashville Terminal Co. v. Lellyett*, 85 S.W. 881, 885 (Tenn. 1905); *Coleson v. Blanton*, 4 Tenn. (3 Hayw. ) 152 (1816) (per curiam). *See also* RESTATEMENT (SECOND) OF TRUSTS §§ 280-82; BOGERT § 869. When a trustee commits a breach of trust, the trustee is personally liable to the trust's beneficiaries. *Morgan v. Elam*, 12 Tenn. (4 Yer.) 375 (1833).

[I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty.

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000) (applying common-law principles in the interpretation of the Employee Retirement Income Security Act of 1974) (citations omitted). *See also, e.g.*, *Cardwell v. Cheatham*, 39 Tenn. (2 Head.) 14 (1858) (stating that a bona fide purchaser for value without notice of a breach of trust takes free of the trust) (citations omitted); *Covington v.*

under Chapter 7 on February 25, 1994. *See Lawyers Title Ins. Corp.*, 21 F. Supp. 2d at 791. The Supreme Court of Tennessee disbarred Cannon effective August 1, 1994. *Id.* In 1995 Cannon pleaded guilty in federal court to charges of embezzlement, mail fraud, wire fraud, and bank fraud and began serving a sentence of forty-two months imprisonment.[4]

### A. The Condition of the Escrow Accounts When Cannon Filed for Bankruptcy

At the time Cannon filed his petition for bankruptcy, the deficiency in his escrow accounts had ballooned to over $3.5 million. This amount was owed to mortgage companies and individuals on real estate closings. When Cannon filed for bankruptcy, the UAB escrow account had a balance of $648.81, and the First Tennessee accounts showed a balance of zero. At all times Cannon commingled the funds of clients in the escrow accounts. In addition, Cannon deposited some legal fees into the escrow accounts in a vain attempt to repay the deficiency, and the balance in the escrow accounts also increased due to Cannon's check kiting.

During the year prior to filing for bankruptcy, Cannon wrote twenty-one checks to Bradford from the escrow accounts totaling $1,137,500. Jeffrey Graham, a certified public accountant retained as an expert by the trustee,

---

[4] In addition to the cases on appeal before this court, Cannon's bankruptcy has generated considerable litigation. In *Lawyers Title Insurance Corp. v. United American Bank of Memphis*, 21 F. Supp. 2d 785, 810-11 (W.D. Tenn. 1998), the district court dismissed in part a suit brought against UAB by the title insurance companies that were required to indemnify insureds who sustained losses when Cannon's scheme collapsed. Although the district court decided that certain claims brought by the title insurance companies could not proceed, genuine issues of fact remained for trial regarding UAB's degree of knowledge and participation in Cannon's scheme. *Id.* In *First Tennessee Bank, N.A. v. Stevenson (In re Cannon)*, 237 F.3d 716, 717 (6th Cir. 2001), we concluded that Article 4 of the Uniform Commercial Code granted First Tennessee a fully secured interest in certain funds provisionally credited to the escrow accounts so that the trustee could not recover these credits as a voidable preference under 11 U.S.C. § 547.

conducted an analysis of the cash flows in and out of the escrow accounts to determine the source of funds Cannon used to pay Bradford. According to Graham's report, the escrow checks came from an approximately $12 million pool of 242 deposits made at or near the time of checks written to Bradford. Of this amount, Graham traced approximately $9.9 million, or 83%, to funds from real estate closings; approximately $1.8 million, or 15%, to kites; and $67,389.77 to Cannon's personal funds, with the balance attributable to undetermined sources.

### B. Commencement of the Adversary Proceeding in Bankruptcy Court

On February 23, 1996, Stevenson filed suit against J.C. Bradford & Co., J.C. Bradford Futures, Inc., and Charles Ross. Counts I through VII of the complaint alleged violations of federal commodities laws, breach of fiduciary duties, fraud, violations of state consumer protection laws, and failure to supervise—all non-core proceedings under 28 U.S.C. § 157(b)(2). In Count VIII the trustee sought to recover under 11 U.S.C. § 548 the $1,137,500 Cannon transferred to Bradford from the escrow accounts, a core proceeding under 28 U.S.C. § 157(b)(2)(H). An amended complaint contained a prayer for relief requesting rescissionary and compensatory damages against all defendants, jointly and severally, in the amount of $2 million plus $6 million in punitive damages and reasonable costs and attorneys' fees on Counts I through VII. On Count VIII the trustee sought $1,137,500, prejudgment interest, and costs.

In an amended answer to the amended complaint, Defendants asserted several affirmative defenses. Of particular relevance to this appeal, Defendants argued that (1) the funds transferred to Bradford from the escrow accounts did not constitute "an interest of the debtor in property," (2) Bradford accepted the checks drawn on the escrow accounts for value and in good faith, and (3) the trustee lacked standing to assert the claims raised in the amended complaint because the victims of Cannon's

standing under Article III and the trustee's powers under the bankruptcy code are coextensive:

> [T]he "case or controversy" requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own.

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

Under 11 U.S.C. § 704(1), a Chapter 7 trustee "shall collect and reduce to money the property of the estate . . . ." Among the "legal and equitable interests of the debtor" included within the "property of the estate" under section 541 are causes of action belonging to the debtor. *Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods.)*, 102 F.3d 223, 225 (6th Cir. 1996) (citation omitted). Because causes of action belong to the estate, section 704(1) grants the trustee the exclusive right to assert the debtor's claims. *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir. 1997) (citing *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994)). If a cause of action belongs solely to the estate's creditors, however, then the trustee has no standing to pursue the claim. *Id.*

Whether a particular cause of action belongs to the debtor so that it constitutes "property of the estate" depends upon state law. *In re RCS Engineered Prods.*, 102 F.3d at 225 (citing *Butner*, 440 U.S. at 48). "However, if the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate and cannot be asserted by a creditor." *In re Van Dresser Corp.*, 128 F.3d at 947 (citing *In re Educators Group Health Trust*, 25 F.2d at 1284). "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action

(1979) (citations omitted). When a plaintiff asserts standing based on a threatened injury, he must show that the threatened injury is so imminent as to be "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 155-58 (1990). Therefore, the alleged injury cannot be "conjectural" or "hypothetical." *Id.* at 155.

Even when a case falls within the parameters of Article III jurisdiction, a party claiming standing must also demonstrate that prudential considerations do not further limit the exercise of a court's power to hear a case. *See, e.g.*, *Warth*, 422 U.S. at 498. "[A]ny inquiry into a litigant's standing to sue involves examination of both constitutional limitations and prudential restrictions." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 456 (6th Cir. 2001) (citation omitted). Broadly speaking, there are three prudential limits on standing ordinarily counseling against the exercise of jurisdiction: (1) alleging a generalized grievance not particular to the plaintiff; (2) asserting the legal rights and interests of a third party; and (3) claiming an injury outside the zone of interests of the statute providing the cause of action. *See, e.g.*, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982).

### B. Standing of the Trustee

"As a creature of statute, the trustee in bankruptcy has only those powers conferred upon him by the Bankruptcy [Code]." *Cissell v. American Home Assurance Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (citations omitted). The trustee stands in the shoes of the debtor and has standing to bring any action that the bankrupt could have brought had he not filed a petition for bankruptcy. *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1404 (6th Cir. 1984); *Cissell*, 521 F.2d at 792. *See also Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d 822, 825-26 (2d Cir. 1997) (citing 11 U.S.C. §§ 541 & 542 and *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 429 (1972)). Therefore, the prudential principles of

misappropriations are not creditors of the estate and had received compensation through their insurance companies or brought separate actions to recover their losses.

In a motion to dismiss Count VIII, the core proceeding, Defendants argued that the funds transferred from the escrow accounts did not constitute "an interest of the debtor in property" within the meaning of section 548 and so did not come within the trustee's avoidance power. After a hearing on the partial-motion to dismiss, the bankruptcy court rejected Defendants' arguments and denied the motion. Stevenson and Defendants filed cross-motions for summary judgment. After denying Defendants' motion and granting in part and denying in part the motion of the trustee, the effect of which was to find that the funds in the escrow accounts were property of the estate under section 548, the bankruptcy court set the case for trial. *Stevenson*, 230 B.R. at 588.

### C. The Bankruptcy Court's Order (No. 00-5624) and Proposed Findings (No. 00-5895)

Upon the conclusion of a nine-day bench trial, the bankruptcy court issued lengthy proposed findings of fact and conclusions of law with respect to the counts alleged in the non-core proceeding[5] and an opinion and order with respect to the trustee's core proceeding to avoid the fraudulent transfer. *See generally Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546 (Bankr. W.D. Tenn. 1999). In the non-core proceeding, the bankruptcy court proposed that the district court find Defendants liable for commodities fraud, fraud, violations of Tennessee's consumer protection laws, breach of fiduciary duties, and failure to supervise. *Id.* at 570-88. The bankruptcy court recommended that the district court enter judgment in favor of the trustee for $2,361,736 in compensatory damages and $5 million in punitive damages plus prejudgment interest. *Id.* at 601.

---

[5]Defendants have not consented to the entry of a final judgment by the bankruptcy court with respect to the claims in the non-core proceeding. *Stevenson*, 230 B.R. at 548.

In the core proceeding, having previously determined that the funds in the escrow accounts were property of the estate, the bankruptcy court found that Cannon transferred funds from the escrow accounts to Bradford with the intent to hinder, delay, and defraud his creditors, *id.* 588-91, and that Bradford did not receive the funds in good faith. *Id.* at 591-94. Therefore, the bankruptcy court concluded that Cannon's disbursement of funds from the escrow accounts to Bradford constituted fraudulent transfers under section 548. *Id.* at 591, 594. On this basis the bankruptcy court ruled that the trustee was entitled to recover the $1,137,500, plus prejudgment interest, transferred to Bradford in the year before Cannon filed for bankruptcy. *Id.* at 600, 601-02.

Defendants timely filed with the bankruptcy court objections to the proposed findings of fact and conclusions of law in the non-core proceeding and a motion to alter or amend the judgment under Rule 9023 of the Federal Rules of Bankruptcy Procedure in the core proceeding. Among the objections raised was Defendants' renewal of the argument previously made in the amended answer to the amended complaint that the trustee lacked standing to assert claims related to Cannon's trading losses. In response to the objections, the trustee asserted that Defendants had raised the standing argument for the first time. Upon review of the objections and responses, the bankruptcy court entered an order amending the proposed findings of fact and conclusions of law with respect to the non-core proceeding and an amended order in the core proceeding. *See generally Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 232 B.R. 701 (Bankr. W.D. Tenn. 1999). For purposes of this appeal, these amendments made no material changes to the bankruptcy court's initial judgment.

to concede it.") (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)); *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 607 (6th Cir. 1998) ("[F]ederal courts have an independent obligation to investigate and police the boundaries of their own jurisdiction."). Because constitutional standing "is always a threshold inquiry" that a court must consider before exercising jurisdiction, *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 922 (6th Cir. 1988) (internal quotation and alteration omitted), the district court cannot have committed error—as the trustee contends—by addressing the trustee's standing to bring the non-core proceeding even if Defendants did not raise such a challenge before the bankruptcy court. We review questions of standing de novo. *Johnson v. Economic Dev. Corp. of the County of Oakland*, 241 F.3d 501, 507 (6th Cir. 2001) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

### A.  Constitutional and Prudential Principles of Standing

To establish standing under the "case or controversy" requirement of Article III of the United States Constitution, a plaintiff:

> (1) must have suffered some actual or threatened injury due the to alleged illegal conduct (the "injury in fact element"); (2) the injury must be fairly traceable to the challenged action (the "causation element"); and (3) there must be a substantial likelihood that the relief requested will redress or prevent [plaintiff]'s injury (the "redressability element").

*Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001), *cert. denied*, 122 S.Ct. 355 (U.S. Oct. 9, 2001) (No. 01-402) (quoting *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999)). As a rule, a party must have a "personal stake in the outcome of the controversy" to satisfy Article III. *Warth*, 422 U.S. at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A "plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99

*Brake Sys., Inc. v. American Envtl. Prot., Inc.*, 963 S.W.2d 749, 755 (Tenn. Ct. App. 1997) ("As a converter, [the defendant] obtained no title to the [property] and could not have transferred any title[.]"). On the undisputed facts, clients deposited funds into Cannon's escrow accounts, which they understood to be express trusts. Under Tennessee law when Cannon converted these funds he acquired no title to them. Therefore, his estate in bankruptcy has no interest in the escrow accounts that brings them within the trustee's avoidance power under section 548.

Because Cannon held the funds deposited into his escrow accounts in express trust for his clients, we hold that these monies are not part of his estate in bankruptcy and so not subject to the trustee's avoidance power under section 548. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1449 (6th Cir. 1994) ("A debtor that served prior to bankruptcy as trustee of an express trust generally has no right to the assets kept in trust, and the trustee in bankruptcy must fork them over to the beneficiary."). *See also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) ("Congress plainly excluded [from the bankruptcy estate] property of others held by the debtor in trust at the time of the filing of the petition."). Since the funds in the escrow accounts are not a part of the estate in bankruptcy, they are not "an interest of the debtor in property." Therefore, the trustee simply has no power to avoid the transfers to Bradford.

### III. The Non-Core Proceeding (No. 00-5895)

We next turn to the district court's ruling that the trustee lacks standing to maintain the causes of action alleged in the non-core proceeding. We have an independent obligation to ensure our jurisdiction over a case even when the parties have not disputed the issue. *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared

### D. The District Court's Judgments

On appeal to the district court in the core proceeding, Defendants argued that the bankruptcy court erred in finding that the funds in escrow were property of the debtor and that the trustee lacked standing to recover any funds fraudulently transferred to Bradford from the escrow accounts because they belonged to clients, not creditors. In an order dated March 31, 2000, the district court agreed with Defendants that the trustee lacked standing to assert claims against Defendants under section 548. Because the trustee's standing implicated the court's jurisdiction under Article III, the district court determined that it could properly entertain the issue for the first time on appeal. Reasoning that under Tennessee law the escrow accounts were express trusts, the district court concluded that Cannon had no equitable interest in the funds transferred to Bradford with the result that the definition of "an interest of the debtor in property" in section 548 excluded them from the estate in bankruptcy. Therefore, the district court reversed the judgment of the bankruptcy court in the core proceeding and entered judgment in favor of Defendants.

In the non-core proceeding, the district court entered a separate order on March 31, 2000, dismissing the trustee's claims against Defendants. Because the money Bradford lost in commodities trades came from escrow accounts Cannon maintained for the benefit of his clients, the district court concluded that Cannon himself suffered no distinct injury as a result of the conduct of Defendants, fraudulent or otherwise. Therefore, the court reasoned, Cannon would not have standing to sue Defendants although his clients who lost money would.

### II. The Core Proceeding (No. 00-5624)

As a threshold matter, Defendants argue that the trustee did not have standing to seek avoidance of the transfers of funds in the escrow accounts belonging to Cannon's clients to Bradford. In response, the trustee assails the judgment of the district court in the core proceeding on the ground that Defendants have asserted for the first time on appeal the

question of standing and the argument that funds held in express trust for Cannon's clients fall outside the scope of section 548.

Because 11 U.S.C. § 548(a)(1) grants the trustee the power to "avoid any transfer of an interest of the debtor in property" made within one year before the debtor filed a petition for bankruptcy, we have difficulty comprehending Defendants' argument that the trustee lacks Article III standing to seek to avoid preferential transfers. Defendants likely advance this argument to circumvent the general rule that a reviewing court will not consider issues raised for the first time on appeal. *See, e.g.*, *Poss v. Morris*, 260 F.3d 654, 663 (6th Cir. 2001); *Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 395 (6th Cir. 1992); *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988). Whether to consider an issue on which the trial court did not pass rests within the discretion of the appellate court and depends upon the facts of individual cases. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Factors guiding the determination of whether to consider an issue for the first time on appeal include:

> 1) whether the issue newly raised on appeal is a question of law, or whether it requires or necessitates a determination of facts; 2) whether the proper resolution of the new issue is clear and beyond doubt; 3) whether failure to take up the issue for the first time on appeal will result in a miscarriage of justice or a denial of substantial justice; and 4) the parties' right under our judicial system to have the issues in their suit considered by both a district judge and an appellate court.

*Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 245 (6th Cir. 1991)). We have also held that exceptional circumstances may warrant a departure from the general rule. *Poss*, 260 F.3d at 663-64; *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993).

funds held in express trust in the escrow accounts does not alter their character, and these funds remain outside the estate under section 548.

When Cannon deposited his own funds, small as they were, into the escrow accounts, he obtained no interest under Tennessee law in the trust corpus that would allow the bankruptcy trustee to avoid the transfers to Bradford as fraudulent. According to the undisputed facts, Cannon deposited personal funds in the escrow account in a vain effort to attempt to repay the misappropriated funds. Under general common law principles, these funds became a part of the escrow account and are added to the sums held in express trust on behalf of Cannon's clients. *See* BOGERT § 929 (explaining that a trustee's later deposits of his own money into a trust account are presumed to be restitution for his stolen funds when the account is expressly labeled a trust account); RESTATEMENT (SECOND) OF TRUSTS § 202 cmt. m; RESTATEMENT OF RESTITUTION § 212 cmt. c (1937). *Accord Goldberg v. New Jersey Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991); *Kupetz v. United States (In re California Trade Technical Schs., Inc.)*, 923 F.2d 641, 646 (9th Cir. 1991).

In addition, when Cannon misappropriated funds from the escrow accounts he obtained no interest in the funds that the trustee can seek to avoid. Under Tennessee law when a fiduciary misappropriates trust funds for personal use, he has converted the funds rather than obtained voidable title by fraud. *See, e.g.*, *Treadwell v. McKeon*, 66 Tenn. 201 (1874). *Accord 222 Liberty Assocs. v. Prescott Forbes Real Estate Corp. (In re 222 Liberty Assocs.)*, 110 B.R. 196, 201 (Bankr. E.D. Penn. 1990) ("A breach of the duty to deliver the escrowed property in the manner described in the agreement has been termed a conversion of the property not delivered.") (citing 28 AM. JUR. 2D *Escrow* § 27 (1966)). For this reason, one who obtains property by conversion acquires no title, voidable or otherwise, to the property converted. *Godwin v. Taenzer*, 119 S.W. 1133, 1133-34 (Tenn. 1909); *Huffman v. Hughlett & Pyatt*, 79 Tenn. 549 (1883). *See also United*

that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, a valid and enforceable express trust exists." *In re Elrod*, 42 B.R. 468, 473 (Bankr. E.D. Tenn. 1984)*. See also Emerson v. Marty (In re Mark Benskin & Co.)*, 135 B.R. 825, 834 (Bankr. W.D. Tenn. 1991) ("If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created.") (quoting *In re Property Leasing & Mgmt., Inc.*, 50 B.R. 804, 807-08 (Bankr. E.D. Tenn. 1985)).

The Tennessee Supreme Court's rules confirm this conclusion: "Attorneys who practice law in Tennessee shall deposit all funds held in trust in this jurisdiction in accounts clearly identified as 'trust' or 'escrow' accounts, referred to herein as 'trust accounts[.]'" TENN. SUP. CT. R. 9, § 29.1(A)(1). Therefore, at all times prior to the filing of his petition for bankruptcy, Cannon possessed only legal title to the funds in escrow while equitable title remained vested in his clients. *See also Lawyers Title Ins. Co.*, 21 F. Supp. 2d at 803 (concluding that Cannon owed fiduciary duties to the beneficiaries of the escrow accounts). Although Tennessee law generally treats claimants of an insolvent trust as general creditors rather than beneficiaries unless they trace their property among commingled funds, *Bragg v. Osborn*, 248 S.W. 19 (1923), *McDowell v. McDowell*, 234 S.W. 319 (1921), in this situation the commingled client funds in the escrow accounts retain their character as property held subject to an express trust. This is so because in Tennessee a lawyer who holds funds belonging to a client must "maintain all such funds in a pooled . . . account for deposit of client funds that are . . . expected to be held for a short period." TENN. SUP. CT. R. 8, DR-9-102(C)(2). *See also* Formal Ethics Op. No. 84-F-68, 1984 WL 262035, at *1 (Tenn. Bd. Prof. Resp. May 29, 1984) ("Because of the impracticality of establishing a separate account for each client, all client funds generally are commingled in the lawyer's trust account."); RESTATEMENT (SECOND) OF TRUSTS § 179 cmt. f (1959) ("[O]rdinarily an attorney ... can properly deposit in a single trust account the funds of all his clients...."). Accordingly, the commingling of

The Supreme Court has committed the question of which circumstances warrant a departure from the general rule to the sound discretion of the appellate courts. *Singleton*, 428 U.S. at 121. Even if Defendants raised the issue for the first time on appeal to the district court, we would not conclude that the district court abused its discretion by considering for the first time on appeal a question of law intimately bound up with the power of the trustee under the bankruptcy code. Further, the record reflects that Defendants in fact raised the argument that the funds transferred from the escrow accounts to Bradford did not constitute "an interest of the debtor in property" in an amended answer to the amended complaint and in the motion to dismiss. In as much as Defendants presented the matter to the bankruptcy court and the issue concerns an important question of law regarding the scope of the trustee's avoidance power under section 548 of the bankruptcy code, we will consider whether the funds Cannon deposited with Bradford constitute fraudulent transfers within the meaning of 11 U.S.C. § 548.

### A.  Standard of Review

When we review appeals from the decisions of a district court in a case originating in bankruptcy court, we directly review the decision of the bankruptcy court rather than the district court's review of the bankruptcy court's decision. *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 607 (6th Cir. 2000). Because we find ourselves in essentially the same position as the district court in reviewing the bankruptcy court's decision, we accord no deference to the district court's decision. *Id.* at 607. "[I]n appeals from the decision of a district court on appeal from the bankruptcy court, the court of appeals independently reviews the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de novo review to conclusions of law." *In re Madaj*, 149 F.3d 467, 468 (6th Cir. 1998) (internal quotations and citations omitted).

Because a grant of summary judgment presents a pure question of law, the district court reviews the bankruptcy

court's grant of summary judgment de novo, as do we in turn. *In re Batie*, 995 F.2d 85, 88-89 (6th Cir. 1993). Likewise the trustee's power to avoid fraudulent transfers under section 548 presents a question of law that we review de novo. *See United States v. Hunter (In re Walter)*, 45 F.3d 1023, 1027 (6th Cir. 1995) (citing *In re Caldwell*, 851 F.2d 852, 857 (6th Cir. 1988), and *In re Loretto Winery Ltd.*, 898 F.2d 715, 718 (9th Cir. 1990)).

### B. Section 548 and the Power of the Trustee

Under 11 U.S.C. § 548(a)(1), the trustee "may avoid any transfer of an interest of the debtor in property" made within one year before the debtor files a petition for bankruptcy. Although the bankruptcy code does not define "property of the debtor," section 541(a)(1) provides that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(d) further provides:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The Supreme Court has interpreted these statutes as including in a debtor's estate "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58 (1990). However, "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Id.* at 59.

State law determines whether funds held in escrow constitute an express trust excluded from the debtor's estate. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (noting that under the bankruptcy code "'property' and 'interests in

property' are creatures of state law") (citing *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370 (1945), and *Butner v. United States*, 440 U.S. 48, 54 (1979)). Under Tennessee law, establishing the existence of an express trust requires proof of three elements:

(1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another, (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit, and (3) identifiable trust property.

*Kopsombut-Myint Buddhist Ctr. v. State Bd. of Equalization*, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1986) (citing G.G. BOGERT & G.T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 1 (rev. 2d ed. 1984) [hereinafter BOGERT], and RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. h (1957)).

[A]t a minimum, there must be a grantor or settlor who *intends* to create a trust; a corpus (the subject property); a trustee; and a beneficiary. The trustee holds legal title and in that sense, owns the property, holding it for the benefit of the beneficiary who owns the equitable title. While the grantor may retain either of these interests, no one may solely hold both as the purpose of separating the two would be defeated.

*Myers v. Myers*, 891 S.W.2d 216, 218-19 (Tenn. Ct. App. 1994) (citations omitted).

Under these principles of Tennessee law, we conclude that the funds Cannon held in escrow for his clients were without question maintained in an express trust. In this case, purchasers of real estate deposited funds in segregated escrow accounts, which Cannon maintained subject to fiduciary duties for the benefit of parties to real estate sales who would receive the money or for whose benefit the money would be paid out upon closing. Accordingly, all of the conditions necessary for creation of an express trust are present in this arrangement. "[W]here a person has or accepts possession of personal property with the express or implied understanding