**In re CYBERCO HOLDINGS, INC., Debtor.**

**Thomas C. Richardson, Trustee, Plaintiff,**

**v.**

**The Huntington National Bank, Defendant.**

**Bankruptcy No. HG 04–14905. Adversary No. 06–80989.**

United States Bankruptcy Court, W.D. Michigan.

Jan. 29, 2008.

Mark A. Kehoe, Esq., Douglas A. Donnell, Esq., Amy S. VanDyke, Esq., Grand Rapids, MI, for Plaintiff.

Robert S. Hertzberg, Esq., Detroit, MI, Laurence Z. Shiekman, Esq., Philadelphia, PA, for Defendant.

### *OPINION*

JEFFREY R. HUGHES, Bankruptcy Judge.

On December 8, 2006, Thomas C. Richardson ("Trustee") commenced this adversary proceeding against The Huntington National Bank ("Huntington"). The original complaint included ten causes of action. However, Huntington never answered that complaint. Huntington chose instead to file a motion to dismiss under FED. R.BANKR.P. 7012(b) and FED.R.CIV.P. 12(b).[1]

Huntington's motion was heard on June 22, 2007. The Chapter 7 Trustee indicated at that hearing that he did not oppose the dismissal of Counts I, II, III and VII. Consequently, I heard argument regarding only the remaining counts of Trustee's complaint. They were:

Count IV—Constructive Trust/Unjust Enrichment

Count V—Preference Payments

Count VI—Avoidance and Preservation of Fraudulent Transfers Pursuant to 11 USC 548(a)(1)(A)

Count VIII—Avoidance and Preservation of Fraudulent Transfers Pursuant to 11 USC 548(a) and 544(b)

Count IX—Recovery and Turn Over of Value of Avoided Transfers Pursuant to 11 USC 542 and 550

Count X—Avoidance of Transfers Pursuant to 11 USC 544, *et seq.*

Both parties supported their respective positions with pre- and post-hearing briefs.

Trustee then complicated matters by filing an amended complaint. It was certainly within the Trustee's right to amend his complaint before I had disposed of Huntington's original motion to dismiss. FED. R.BANKR.P. 7015 and FED.R.CIV.P. 15(c). Indeed, the amended complaint has eliminated some of the issues raised in Huntington's original motion.

However, the amended complaint confuses matters by rearranging the order of the remaining six counts. These counts as now pled are:

Count I—Preference Payments (formerly Count V)

Count II—Avoidance and Preservation of Fraudulent Transfers Pursuant to 11 USC 548(a)(1)(A) (formerly Count VI)

Count III—Avoidance and Preservation of Fraudulent Transfers Pursuant to 11 USC 548(a), 544(b) and the Michigan Uniform Fraudulent Transfers Act (formerly Count VIII)

Count IV—Constructive Trust/Unjust Enrichment (also Count IV under original complaint)

---

1. Unless otherwise indicated, all further citations in this opinion to "Bankruptcy Rule ____" will be to the Federal Rules of Bankruptcy Procedure and citations to "Rule ____" will be to the Federal Rules of Civil Procedure.

Count V—Recovery and Turn Over of Value of Avoided Transfers Pursuant to 11 USC 542 and 550 (formerly Count IX)

Count VI—Avoidance of Transfers Pursuant to 11 USC 544 et seq. (formerly Count X).

The amended complaint also changes the amounts Trustee contends Huntington received as preferential and fraudulent conveyances. Trustee now alleges that the preferential transfers CyberCo made to Huntington total $9,718,179.36 instead of the $6,131,981.48 as pled originally, that the Section 548[2] fraudulent conveyances may have been millions of dollars less than what had been pled originally, and that the Section 544(b)/Michigan Fraudulent Transfer Act conveyances may have been millions of dollars more than what had been originally pled.

Huntington, in turn, has elected to file an amended motion to dismiss. Huntington's amended motion, like Trustee's amended complaint, eliminates some points of controversy between the parties. First,

Huntington is now satisfied that Trustee's amended Count II sets forth with sufficient specificity Trustee's contention that CyberCo made transfers to Huntington with the actual intent to hinder, delay or defraud its creditors. Huntington is satisfied as well that Trustee's amended Count I adequately identifies the transfers by CyberCo to Huntington that Trustee wishes to avoid as preferential.[3]

However, Huntington also adds a new reason as to why Trustee's preference and fraudulent conveyance actions should be dismissed: the Section 546 statute of limitations. There is no question Trustee filed his amended complaint outside the two-year deadline imposed by that section. However, as Huntington itself recognizes, Trustee's amended complaint would not be time-barred to the extent the transfers referenced therein were the same transfers referenced in the original complaint. FED.R.BANKR.P. 7015 and FED.R.CIV.P. 15(c). Huntington, though, contends that the transfers now alleged in Trustee's

---

**2.** 11 U.S.C. § 548. Debtor's petition predates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L.No. 109–8, § 1501(b)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. will be to the Code as written prior to the BAPCPA amendments. In most instances, the citation will be simply "Section _____." However, on occasion the citation will be "Section _____ (pre-BAPCPA)."

**3.** Huntington's amended motion also clarifies its challenge of Trustee's fraudulent conveyance counts. Trustee's original complaint alleged that Huntington had received fraudulent transfers both under Section 548 and under the Michigan Fraudulent Transfer Act (via Section 544(b)). Trustee's original complaint also split the Section 548 claim into separate counts for actual fraud (original Count VI) and constructive fraud (original

Count VII). However, Trustee's original complaint did not divide his MFTA/Section 544(b) claim into two similar counts for actual and constructive fraud. Rather, Trustee included both theories in a single count (original Count VIII).

Huntington's original motion to dismiss in turn challenged both Trustee's actual and constructive fraud counts under Section 548. However, Huntington's original motion to dismiss challenged only Trustee's constructive fraud allegations under his MFTA/Section 544(b) count. It would appear that this omission was an oversight given that Huntington's arguments for dismissing the Section 548 actual fraud count would have been equally applicable to the actual fraud portion of Trustee's MFTA/Section 544(b) count.

In any event, Huntington's amended motion to dismiss makes it clear that its intent is to challenge Trustee's actual fraud theories both under Section 548 (amended Count II) and MFTA/Section 544(b) (amended Count III).

amended fraudulent transfer and preference counts comprise an entirely new set of transfers and, as such, they fall outside the "relation-back" provisions of Rule 15(c).

## DISPOSITION OF HUNTINGTON'S AMENDED MOTION TO DISMISS

Huntington's amended motion to dismiss for the most part simply repeats arguments already made in its original motion. For example, Huntington persists in its contentions that Trustee's count for unjust enrichment/constructive trust should be dismissed because Trustee lacks standing and that Trustee's fraudulent conveyance counts fail because Trustee is unable to establish that the subject transfers caused any diminution of CyberCo's assets. Therefore, these aspects of Huntington's amended motion to dismiss can be disposed of just as easily through Huntington's original motion to dismiss.

■ Huntington's amended motion differs from its original motion only because it adds the new statute of limitations argument. However, pleading that defense at this time is inappropriate because Huntington has not yet answered Trustee's amended complaint. It is quite clear under the applicable rules that statute of limitations is an affirmative defense that is to be raised in conjunction with the defendant's response to the plaintiff's complaint. FED.R.BANKR.P. 7008 and 7012 and FED. R.CIV.P. 8(a) and 12(b). Granted, Rule 12(b) permits a defendant to forgo an answer and to instead file a motion to dismiss based upon certain defenses. However, a statute of limitations defense is not among the six exceptions recognized by Rule 12(b). Consequently, a defendant must wait until after it has formally pled the statute of limitations as an affirmative defense before it can seek dismissal of the complaint on that basis. Although such post-answer motions are frequently described as arising under Rule 12(b), they in fact arise under Rule 12(c).

(c) **Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

FED.R.CIV.P. 12(c).[4]

Huntington cites *Rauch v. Day and Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir.1978), for the proposition that dismissal under Rule 12(b) may also be based upon a statute of limitations defense. However, *Rauch* actually involved a Rule 12(b) dismissal for want of personal jurisdiction. Specifically, plaintiffs had commenced an action in federal district court based upon diversity jurisdiction. The defendant, in turn, apparently filed a motion to dismiss the complaint because of the applicable statute of limitations. However, the defendant did not proceed with its motion at that time. Rather, the trial court, with the parties' consent, postponed consideration for nearly two years.

---

4. Effective December 1, 2007, Rule 12(c) was amended as follows:

(c) **Motion for Judgment on the Pleadings.** After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

When the trial court finally heard the motion, it dismissed two of the plaintiffs because the statute of limitations had run. However, the trial court was unable to determine that the remaining plaintiff's claim was similarly time-barred because of a question of fact. Nonetheless, the trial court concluded that it did not have personal jurisdiction over the defendant and, therefore, it dismissed the remaining plaintiff's claim for this separate reason.

The focus of the Sixth Circuit's review on appeal was whether the defendant had waived the personal jurisdiction defense. The problem was that the defendant had not raised it as a defense when it filed its original Rule 12(b) motion but had instead waited until that motion was actually argued some two years later. The Sixth Circuit determined that defendant's delay precluded it from asserting the defense. *Id.* at 702. *See also,* FED.R.CIV.P. 12(g) and (h).

It was in this context, then, that the Sixth Circuit discussed Rule 12(b) motions and a defense based upon a statute of limitations. It was raised only because the defendant had argued that Rules 12(g) and (h) were inapplicable under the circumstances. Specifically, the defendant had argued that its original Rule 12(b) motion was invalid because that rule did not include a statute of limitations defense within its scope and, as such, the defendant had not technically triggered a Rule 12(g) or (h) waiver of its separate personal jurisdiction defense.

The Sixth Circuit was not persuaded.

It [defendant's motion to dismiss] was treated in all respects and at all times by the parties and the court as a Rule 12 motion to dismiss. We see no reason in law or in justice to treat it differently here.

*id.*

Put simply, the Sixth Circuit was unwilling to let defendant off the hook on a technicality when the facts otherwise established that the defendant had submitted itself to the trial court's jurisdiction. Consequently, it is difficult to characterize *Rauch* as a deliberate declaration by the Sixth Circuit that statute of limitations is a seventh "phantom" defense that may be raised in a Rule 12(b) motion.[5]

## DISPOSITION OF HUNTINGTON'S ORIGINAL MOTION TO DISMISS

### A. *Standard of Review*

Huntington contends that Trustee lacks standing in amended Count IV (also original Count IV) to impose a constructive trust upon it or, in the alternative, to recover damages on a theory of unjust enrichment. Therefore, it argues that that count should be dismissed for lack of subject matter jurisdiction. FED.R.BANKR.P. 7012(b) and FED.R.CIV.P. 12(b)(1). As for the remaining counts, Huntington argues that they too should be dismissed because Trustee in each instance has failed to state a claim upon which relief may be granted. FED.R.BANKR.P. 7012(b) and FED.R.CIV.P. 12(b)(6).

The plaintiff has the burden of proving subject matter jurisdiction by a preponder-

---

5. It is possible, of course, that I have misinterpreted *Rauch*. However, I am willing to take that risk given that Huntington's original motion presents a significant number of issues on its own. Deferring Huntington's statute of limitations argument to a later date simplifies the record considerably. More-over, I perceive no harm to the parties. Although both Huntington and Trustee have now filed briefs regarding the amended motion, those briefs can easily be resubmitted when Huntington files its expected Rule 12(c) motion.

ance of the evidence. *Hedgepeth v. Tennessee*, 215 F.3d 608, 611 (6th Cir.2000). When considering a motion that questions the existence of jurisdiction, no presumption of truthfulness applies to the factual allegations in the pleadings. *Ohio Nat. Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir.1990). Rather, the defendant may insist that the court actually take proofs to determine whether the factual predicate necessary for standing exists. In this instance, though, Huntington has not looked beyond Trustee's complaint itself to support its argument that Trustee lacks standing. Consequently, I am to proceed with its Rule 12(b)(1) motion on the assumption that all of Trustee's averments supporting Count IV are true. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004) *cert. denied*, 544 U.S. 961, 125 S.Ct. 1733, 161 L.Ed.2d 603 (2005).

I am also required to treat all well-pled allegations as true in determining whether dismissal is appropriate under Rule 12(b)(6).

> A motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief.

*Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir.1998) (citation omitted).

### B. *Background*

Trustee describes CyberCo as nothing more than an instrumentality through which Barton Watson and a few other fellow conspirators engaged in a fraud that "cost scores of lenders and equipment finance companies collective losses approaching $100 million." ¶ 1, Amended Complaint.

> CyberCo was engaged in a scheme to defraud leasing companies and other financial institutions throughout the United States, using fraudulent financial reports, tax returns, invoices, checks, and other documents and instruments. The Principals [of CyberCo] used affiliated corporations, including Teleservices, Corporate Property Associates, and T-Resources, to engage in various frauds. The most significant of these was a Ponzi scheme, using new loans to pay off old loans in an ever increasing cycle of debt, all to the detriment of CyberCo's creditors and ultimate financial ruin of CyberCo.

¶ 12, Amended Complaint.

> By late 2004, Cyberco had fraudulently obtained equipment financing from over 40 financial institutions to whom monthly rental payments were being made. As with most Ponzi schemes and similar frauds, Cyberco was forced to increase both the amount and frequency of fraudulent new purchase/lease deals in order to pay off existing fraudulent lease obligations, support lavish lifestyles of its Principals, and hide prior looting and mismanagement of Cyberco's assets.

¶ 18, Amended Complaint.[6]

Trustee's amended complaint also states that Huntington, as CyberCo's bank from

---

**6.** The Sixth Circuit has described a "classic 'Ponzi' scheme" as "an investment scheme in which investors are promised excessive returns on investments and, where, typically initial investors are paid the promised returns to attract additional investors." *Wesbanco Bank Barnesville v. Rafoth (In re Baker &* *Getty Financial Services, Inc.)*, 106 F.3d 1255, 1257 (6th Cir.1997). Trustee's complaint is silent as to the returns that were being promised to the lending institutions. However, Trustee does allege that Watson and his cohorts were generating cash through successive fraudulent transactions to sustain Cyber-

2002 until CyberCo's demise in late 2004, perpetuated the fraudulent scheme by intentionally overlooking numerous warning signs. Trustee contends that Huntington was willing to cast a blind eye to CyberCo's transgressions because Huntington itself was owed over $17 million and it was clear that CyberCo's financial condition was deteriorating. Indeed, it appears that Huntington was finally able to extricate itself from its lending relationship with CyberCo only months before CyberCo collapsed.

### C. *Unjust Enrichment/Constructive Trust* (Amended Count IV and Original Count IV)

Count IV, as originally pled and as amended, speaks only about imposing a constructive trust with respect to the "ill-gotten gains"[7] Huntington allegedly realized from CyberCo's fraud. However, the caption of amended Count IV also references unjust enrichment. Moreover, Trustee's argument that Huntington's retention of these gains would be "unjust, unconscionable, and inequitable,"[8] would support a claim for unjust enrichment as well. And finally, the relief Trustee ultimately seeks from Huntington, that being a recovery of the monies Huntington received, is certainly compatible with the theory of unjust enrichment. Therefore, I am addressing Huntington's motion as if Trustee has alleged both constructive trust and unjust enrichment as alternative theories for the relief he seeks under amended Count IV.

■ Michigan recognizes unjust enrichment and constructive trust as two separate remedies. Each is designed to eliminate injustice no matter how it may have occurred.

> Doctrine of 'unjust enrichment' is that person [sic] shall not be allowed to profit or enrich himself inequitably at another's expense.
>
> Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another.

*McCreary v. Shields,* 333 Mich. 290, 294, 52 N.W.2d 853 (1952) (citations omitted).

> The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor.

*Buell v. Orion State Bank,* 327 Mich. 43, 56, 41 N.W.2d 472 (1950) (citation omitted).

> Constructive trusts arise by operation of law, not by agreement or from intention, and are raised by a court of equity whenever it becomes necessary to prevent a failure of justice.

*McCreary v. Shields,* 333 Mich. at 294, 52 N.W.2d 853 (citation omitted).

> [T]his form of trusts [*i.e.,* constructive trust] is practically without limit, and is raised by a court of equity whenever in the opinion of the court it becomes necessary to prevent a failure of justice.

*Weir v. Union Trust Co.,* 188 Mich. 452, 464, 154 N.W. 357 (1915).

■ Indeed, it is fair to say that the distinction between these two causes of action lies only in the relief that may be awarded. Unjust enrichment, which is the older doctrine, derives generally from the

---

Co's operations and their own lifestyles. It also appears that a significant portion of the cash generated from Watson's later escapades was being used to service prior lenders that he had allegedly duped.

7. ¶ 129, Amended Complaint.

8. ¶ 129, Amended Complaint.

common law and specifically from the action of assumpsit. The common law courts originally used assumpsit to award damages when an actual contract had been broken. However, over time, the common law courts expanded the remedy first to award damages where a contract could be "implied" and then to award damages for virtually any situation where it appeared that the defendant had received an unjust benefit at the plaintiff's expense. The common law courts, though, did not have the ability to actually order the return of specific property that had unfairly enriched a party. For example, A could not compel B under common law to return a horse that A had mistakenly given to B. All that A could recover from B under an action for general assumpsit was a money judgment for the horse's value.

The courts of chancery, on the other hand, were able to order such recoveries because of their equitable powers. Consequently, those courts fashioned actions based upon legal fictions such as constructive trusts and equitable liens. For example, a court of equity could find that the horse B had mistakenly received was held in constructive trust by B for the benefit of A and then order B to return the horse under the terms of that trust.

■ The merger of law and equity has blurred the distinction between common law actions for unfair enrichment and equitable actions for constructive trusts. Nonetheless, the distinction is still there. An action based upon unjust enrichment is available only if the relief sought by the plaintiff is limited to monetary damages (*i.e.*, recompense for the defendant's unwarranted gain). If the plaintiff seeks instead the recovery of something specific (*e.g.*, the reconveyance of real property fraudulently procured), then the plaintiff must bring an action for the imposition of a constructive trust with respect to the object sought so that the defendant can then be compelled to account for it. *See generally*, Restatement of Restitution: Introductory Note (1936).

■ The converse is also true. That is, a constructive trust is available as a remedy only if there is property that the defendant is able to return.

*i. Necessity of trust property.* A constructive trust does not arise unless there is property on which the constructive trust can be fastened, and such property is held by the person to be charged as constructive trustee (compare Restatement of Trusts, § 74). Thus, although a constructive trust arises where a transfer of the title to land or a chattel or a chose in action is obtained by fraud, yet where by fraud a person is induced to render services, no constructive trust arises, even though the person rendering the services is entitled to recover the value of his services.

\* \* \*

So also, a constructive trust no longer continues when the person chargeable as constructive trustee of property no longer holds the property or other property which is its product. As to reaching the product, see §§ 202–215 (Chapter 13). Restatement of Restitution, § 160, Comment *i* (1936).

In other words, if the defendant has already sold the subject property, the only relief remaining is to sue the defendant for damages under the common law theory of unjust enrichment. There would be no need under such a circumstance for equity to intercede, either with a constructive trust or otherwise.

■ Michigan law is consistent with the Restatement. If a Michigan court is to order a constructive trust, there first must

be a *res* (*i.e.,* identifiable property) in the possession or control of the defendant against which to impose that trust. Otherwise, there is no point to the relief. Damages will do.

In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances, which render it unconscionable for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property, either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust.

*Morris v. Vyse,* 154 Mich. 253, 257–8, 117 N.W. 639 (1908) (citing 3 Pomeroy on Equity Jurisprudence, § 1053).

Where money or property has been taken from its owner by fraud and deceit, it is impressed with a constructive trust, and when clearly traced may, ans [sic] should be, by a court of equity, returned directly to its owner. 3 Pomeroy on Equity Jurisprudence, § 1053.

*Biddle v. Biddle,* 202 Mich. 160, 167, 168 N.W. 92 (1918). *See also, Potter v. Lindsay,* 337 Mich. 404, 411, 60 N.W.2d 133 (1953).[9]

 Nowhere in Trustee's amended Count IV does he identify specifically the property that is to be subject to the constructive trust he requests. At most, Trustee vaguely asks that a constructive trust be imposed upon the approximately $69 million in transfers Huntington allegedly received from CyberCo during the two years preceding CyberCo's 2004 involuntary petition. *See,* ¶¶ 84 and 127, Amended Complaint. Granted, Trustee complains that Huntington has unjustly benefitted from its receipt of these transfers. ¶ 129, Amended Complaint. However, for purposes of imposing a constructive trust, that is not enough. Indeed, amended Count IV is actually more plausible as a complaint for unjust enrichment given that Trustee is in reality simply seeking from Huntington money damages for the unfair benefits he claims Huntington received as the result of its business dealings with CyberCo.[10]

---

**9.** Trustee cites *In re Estate of Swantek,* 172 Mich.App. 509, 432 N.W.2d 307 (1988), to suggest that a constructive trust may be imposed generally upon a defendant's property as long as the defendant at some point in time had unfairly acquired identifiable property from the plaintiff. However, Trustee reads *Swantek* too broadly. Moreover, the genealogy of that portion of *Swantek* dates back to *Detroit Trust Co. v. Struggles,* 283 Mich. 471, 474–5, 278 N.W. 385 (1938), which unequivocally limits the imposition of a constructive trust to only those instances where the defendant is in possession or control of either the subject property itself or proceeds traceable to that property.

**10.** This is not to suggest that a bankruptcy trustee could not have a claim for a constructive trust in the appropriate circumstances. For example, if a debtor had a claim immediately before the commencement of a case that justified imposing a constructive trust upon the third party, it is axiomatic that the bankruptcy trustee would succeed to that cause of action by operation of Section 541(a)(1). *See also, Mason v. Zorn Industries, Inc. (In re Underground Storage Tank Technical Services Group, Inc.),* 212 B.R. 564, 571 (Bankr. E.D.Mich.1997).

Evaluating amended Count IV as an action for unjust enrichment in turn clearly exposes why Trustee does not have standing to bring this claim. Trustee's allegations, if true, suggest that Huntington unfairly extricated itself from its lending relationship with CyberCo at the expense of any number of leasing companies and other financial institutions that were duped by Walson and his accomplices. However, Trustee's charge under the Bankruptcy Code is not to remedy all wrongs Huntington may have committed. Rather, Trustee may proceed against Huntington only to the extent the Bankruptcy Code specifically permits.

Section 541(a)(1), which provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate, has been universally interpreted as allowing a bankruptcy trustee to succeed to whatever causes of action the debtor itself may have had at that time. *See, e.g., In re Cannon,* 277 F.3d 838, 853 (6th Cir.2002). For example, a bankruptcy trustee is entitled to collect accounts receivable due a debtor because the debtor had rights under contract against the various account debtors at the commencement of his bankruptcy case and the bankruptcy trustee succeeded to those rights. Similarly, a bankruptcy trustee is entitled to recover from a debtor's tortfeasor because the trustee succeeded to the debtor's cause of action when he filed his petition.

Count IV of Trustee's amended complaint, though, is devoid of any claim that CyberCo itself was injured as a result of Huntington's alleged "ill-gotten" gains or that CyberCo itself is otherwise deserving of recompense because Huntington has been unjustly enriched. To the contrary, Trustee contends that CyberCo was in the thick of the injustice being perpetrated. It is black letter law that a corporation can act only though its agents and, in CyberCo's case, those agents (*i.e.,* Watson and his co-conspirators) were the ones who were engaged in the fraud. ¶ 11, Complaint. Put differently, it would be inconceivable that CyberCo, which the Trustee alleges was complicit in the funneling of fraudulently procured funds from Watson's victims to Huntington, could entertain an action for unjust enrichment against Huntington had CyberCo not been placed in an involuntary bankruptcy proceeding. If anything, the payments to Huntington benefitted CyberCo, for not only did those payments eliminate a multi-million dollar debt that CyberCo owed to Huntington, but those payments also allowed CyberCo to continue the illusion that it was financially sound. Consequently, it is difficult to understand how Trustee, as CyberCo's successor-in-interest, can now claim that Huntington has been unjustly enriched to CyberCo's detriment.

Trustee relies upon *Perry v. Bankston,* 1997 WL 33349249 (Mich.App.) to suggest that a person need not actually be the beneficiary of the relief sought in order to have standing to bring an action for unjust enrichment. However, *Perry* is an unreported case and, therefore, it is not binding precedent under applicable Michigan court rules. MCR 7.215(C)(1). Second, *Perry* involved the recovery of apparently identifiable life insurance proceeds under a theory of constructive trust, as opposed to simply the recovery of damages for unjust enrichment. And finally, the party asserting the constructive trust in *Perry* on behalf of the victim also had a legally cognizable relationship with the victim: she was his mother. However, Section 541 creates no comparable relationship between Trustee and any of CyberCo's creditors. Indeed, the relationship upon which Section 541 is based is between Trustee and CyberCo, the alleged villain. Consequently,

Trustee's comparison between *Perry* and Trustee's own circumstances is misplaced.[11]

Trustee also has cited *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838 (6th Cir.2002), for the proposition that "a successor trustee, even one standing in the shoes of a criminal debtor, does have standing to recover funds that the debtor had previously transferred." Trustee's Supplementary Brief Post–Hearing, p. 8 [Dkt. No. 25]. *Cannon*, though, involved a debtor who had been a real estate lawyer and who, in that capacity, had received large amounts of money to be held in escrow in connection with numerous closings. The debtor understood that he held those funds in trust for the benefit of others. Nonetheless, the debtor used the escrowed monies to, among other things, trade commodity futures. The debtor's gamble did not pay off and, as a consequence, the trustee in the debtor's subsequent bankruptcy proceeding sued the brokerage firm for its alleged involvement in the failed commodity transactions. The Sixth Circuit determined that the bankruptcy trustee had standing to sue the brokerage firm because the debtor also would have had standing to sue the brokerage firm. It made no difference that the debtor in *Cannon* had himself misap-propriated the funds because the debtor remained as the person to whom the escrowed funds had been entrusted. It followed, then, that if the debtor could still bring an action on behalf of these persons, the bankruptcy trustee, as the debtor's successor under Section 541(a)(1), could do so as well.

However, Trustee has not alleged that the monies CyberCo transferred to Huntington were held by CyberCo in an express trust for the benefit of the various leasing companies and other financial institutions. To the contrary, Trustee alleges that CyberCo was an instrumentality used by Watson and his accomplices to defraud these parties of their money. Unlike the debtor in *Cannon*, CyberCo would not have had standing outside of the bankruptcy context to have brought actions on behalf of these defrauded entities as their trustee. Therefore, Trustee, as CyberCo's successor-in-interest under Section 541(a)(1), does not have any standing either.[12]

 Trustee argues in the alternative that he may still bring his unjust enrichment and constructive trust claims against Huntington as a hypothetical judgment

---

**11.** The Chapter 7 Trustee's reliance on *Kent v. Klein*, 352 Mich. 652, 91 N.W.2d 11 (1958), fails as well. *Kent* involved the imposition of a constructive trust upon a gift of property that was conveyed to one man but that was intended for the benefit of another. The beneficiary of the gift died without ever knowing that a gift had been made. However, when the beneficiary's widow and son learned of it, they requested the court to impose a constructive trust *against the transferee for their benefit*. Their interests as the beneficiary's heirs clearly gave them standing to seek this relief.

**12.** Trustee does make the sweeping generalization in his post-hearing brief that "[a]ll of Cyberco's creditors were victims of Cyberco's fraud at some level." Trustee's Supplemental Brief Post–Hearing, p. 10 [Dkt. No. 25]. However, even a liberal interpretation of Trustee's complaint does not support this contention. It can be inferred from the pleadings that many, if not most, of those who did business with CyberCo were victims of the fraud. "Many," or even "most," though, is not all. Moreover, even if all those who did business with CyberCo were victims, it is each victim's right to proceed separately against Huntington on whatever theory it may choose. A bankruptcy trustee cannot pretend to be their ombudsman, especially when the trustee stands in the shoes of the victims' persecutor.

lien creditor under Section 544(a)(1).[13]

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

11 U.S.C. § 544(a)(1).

Trustee, though, has offered nothing to support what appears to be his contention: that a creditor whose judgment arises only from a simple contract for the extension of credit to CyberCo can then impose a constructive trust upon Huntington or otherwise recover damages as a post-judgment remedy. Logic alone suggests that imposing constructive trusts or recovering damages against third parties does not fall within the scope of a judgment creditor's post-judgment remedies and that such relief instead is available only if the judgment creditor initiates a separate lawsuit against the third party on one or both of those theories. In any event, Trustee's rights under Section 544(a)(1) are limited to only those that the hypothetical permits. As already discussed, a claim against Huntington for either unjust enrichment or constructive trust would require at a minimum a showing of unfair benefit by Huntington at the expense of the creditor in question. In this instance, though, all that Trustee has the right to assert as the hypothetical creditor under Section 544(a)(1) is that he has a claim against CyberCo and then only a claim based upon breach of a simple contract. There is nothing within the hypothetical to support the additional elements Trustee needs in order to secure a separate recovery against Huntington based upon either constructive trust or unjust enrichment.

Therefore, Count IV of Trustee's amended complaint must be dismissed.

### D. Fraudulent Conveyances with Actual Intent—Section 548(a)(1)(A) (Amended Count II and Original Count VI)

■ Trustee's original complaint set out only the barest of allegations to support his contention that Huntington was the recipient of transfers made by CyberCo with the actual intent to defraud its creditors. However, Trustee's amended complaint states with specificity his theory. According to Trustee, Watson's ongoing fraud with the various lenders and equipment finance companies had created a situation where Watson could sustain the fraud only by also sustaining CyberCo and the various other entities he had been utilizing in his scheme. If, for example, CyberCo failed, then Trustee argues that the whole house of cards would have fallen down around Watson and his co-conspirators. Consequently, Trustee contends that CyberCo had to continue placating Huntington since Huntington was CyberCo's primary lender. The gist, then, of Trustee's Section 548 fraudulent conveyance action (i.e., Count II of Trustee's amended complaint) is that CyberCo made the huge transfers to Huntington within the year

---

**13.** Trustee's Brief in Opposition to Defendants' Motion to Dismiss Complaint [Dkt. No. 16], p. 8 n. 3.

preceding its bankruptcy [14] with the intention of hindering and delaying its other creditors, including those persons who had claims against CyberCo for its involvement in the ongoing Ponzi scheme alleged.

As already discussed, Huntington no longer asserts that Trustee's Section 548 count lacks the specificity necessary to survive a Rule 12(b) motion. Indeed, Trustee's amended Section 548 count includes what Huntington adamantly argues is a crucial element of any fraudulent conveyance action: an averment that CyberCo's estate diminished in value as a consequence of the transfers made.

> The Code Transfers to Huntington depleted the value of the debtor's estate because Huntington's loans to Cyberco were grossly undersecured, and as a result of such Transfers, money that otherwise would have been available to the estate went to pay down Huntington.

¶ 109, Amended Complaint.

However, Huntington argues that Trustee's Section 548 claim still fails because the complaint itself contradicts what Trustee alleges. Specifically, Huntington contends that whatever it received from CyberCo had to have been proceeds from its collateral since, as Trustee concedes earlier in his complaint, Huntington had "a security interest in virtually all of the assets of Cyberco." ¶ 28, Amended Complaint. According to Huntington, then, it is irrelevant whether it was undersecured or not, for it in any event received from CyberCo only what in effect already belonged to it because of its secured position. Consequently, CyberCo's estate, at least from the perspective of its other creditors, had not been depleted.

Trustee points out, though, that his amended complaint makes it quite clear that the huge payouts Huntington was receiving from CyberCo shortly before its demise were not coming from the collection of assigned accounts receivable. Trustee contends instead that Teleservices Group, Inc. ("Teleservices"), a related company, was the sole source of the payments received and that Huntington had no claim to those monies. In other words, Huntington benefitted as much from the so-called Ponzi scheme Watson was running as did Watson himself. Watson would allegedly dupe new lenders and leasing companies into believing that they were financing computer equipment being purchased by CyberCo from Teleservices and then, according to Trustee, Teleservices would share its plunder with CyberCo directly and Huntington indirectly.

However, Trustee fails to consider in full what he claims transpired. For purposes of this motion, one must accept Trustee's allegation that most, if not all, of the payments Huntington received from CyberCo that are the subject matter of Trustee's fraudulent transfer claims were traceable to transfers from Teleservices and that all of those transfers in turn represented loan proceeds that Teleservices had itself procured by fraud. However, as Trustee himself concedes, nearly $7 million of the transfers Huntington received in payment of its indebtedness during the last half of 2004 were by checks made payable directly to Huntington from Teleservices' own accounts. ¶ 82, Amended Complaint. Consequently, Trustee has no right to recover as fraudulent any of these transfers because CyberCo never had an interest in those

---

14. Section 548 as now amended permits the avoidance of transfers made within two years preceding the commencement of the debtor's case instead of just one year. However, as already indicated, the involuntary petition against CyberCo was filed prior to BAPCPA's effective date.

monies in the first place.[15]

As for the balance of the allegedly fraudulent transfers, Trustee contends that they were accomplished by Huntington "sweeping" the accounts CyberCo maintained with it whenever CyberCo would have Teleservices deposit funds on its behalf. *See, e.g.,* ¶¶ 58, 80 and 83, Amended Complaint. Key to this aspect of Trustee's fraudulent conveyance theory is Trustee's further contention that the monies that Huntington swept from those accounts were not subject to Huntington's security interest and, therefore, could have been used to benefit CyberCo's many other creditors had the transfers not been made to Huntington. In fact, Trustee emphasizes in his amended pleadings that CyberCo controlled these accounts and that the Huntington sweeps occurred only after CyberCo had paid other creditors, including the ones who believed they had made valid computer loans to CyberCo. *See,* ¶¶ 58 and 80, Amended Complaint.

However, it appears from the pleadings that Huntington in fact did have a security interest in these deposited funds. Included among the numerous documents Trustee has attached to his amended complaint is the security agreement between Cyber-

Co and Huntington. ¶ 28, Amended Complaint and Ex. 5, Original Complaint.[16] Paragraph 2 of the security agreement grants to Huntington a security interest in all personal property, including deposit accounts. *Id. See, e.g.,* MICH. COMP. LAWS §§ 440.9109(1)(a), 440.9203(2)(c)(iv) and 440.9314. Although the law does limit the granting of security interests in deposit accounts to only those that the creditor controls, Huntington was clearly in control of the CyberCo accounts from which the deposits were swept because they were all maintained at Huntington. MICH. COMP. LAWS § 440.9104(1)(A). Moreover, it makes no difference that CyberCo also had access to these accounts. MICH. COMP. LAWS § 440.9104(2).

Huntington's security interest in the Teleservices funds would have attached then at the same time they were deposited into CyberCo's bank accounts.[17] Consequently, Huntington's subsequent sweeps of those accounts would not have diminished CyberCo's "estate" vis-a-vis its other creditors. For example, another CyberCo creditor would not have been able to successfully garnish those funds had they not been swept by Huntington. Huntington's security interest in the deposited funds

---

**15.** There is, of course, the theory that the direct transfers from Teleservices to Huntington had been earmarked for CyberCo's benefit. However, that argument is usually raised as a defense by alleged recipients of avoidable transfers. *See, e.g., Mandross v. Peoples Banking Co. (In re Hartley),* 825 F.2d 1067 (6th Cir.1987). In any event, Trustee's allegations are insufficient to consider its application in this instance.

**16.** Copies of written instruments that are attached to a pleading are part of that pleading for all purposes. FED.R.BANKR.P. 7010 and FED.R.CIV.P. 10(c).

**17.** CyberCo did have rights in the funds transferred to its accounts by Teleservices even though Trustee alleges that all of those funds

had been procured by fraud. Teleservices did not steal those funds; rather, it tricked its victims into lending it money. Consequently, while the interests Teleservices, and then CyberCo, may have acquired were voidable, they were nonetheless capable of being attached under Article 9.

I would also note that the outcome would be no different if Teleservices had instead stolen the monies outright and then deposited its loot in CyberCo's accounts. Granted, Huntington's interest in those monies would have been void since a security interest cannot be taken in stolen property. However, the same would have to be said of whatever claims CyberCo's other creditors might have had in those monies. A thief's judgment creditor cannot garnish his swag any more than can the thief's lender take it as collateral.

would have given it priority over the same.[18]

The question, though, remains as to whether the secured position that Huntington enjoyed in the funds it swept from Huntington's accounts is fatal to Trustee's Section 548(a)(1)(A) claim. "Diminution" certainly is not an expressed element of that cause of action.

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted ...

11 U.S.C. § 548(a)(1)(A) [pre-BAPCPA].

However, "interest of the debtor in property" is worth examining closer.

The Bankruptcy Code also refers to the debtor's "interest in property," as opposed to the property itself, when it describes what becomes property of the bankruptcy estate upon the commencement of a case.

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
>> (1) Except as provided in subsections (b) and (c)(2) of this section, all

legal or equitable **interests of the debtor in property** as of the commencement of the case.

11 U.S.C. § 541(a)(1) (emphasis added).

Therefore, if a Chapter 7 debtor owned only an undivided half interest as a co-tenant in Blackacre at the commencement of his case, then only that undivided interest would have become property of the ensuing bankruptcy estate. The other undivided interest would remain outside of the estate.

As I explained in *Talbert v. City Mortgage Services (In re Talbert)*, 268 B.R. 811 (Bankr.W.D.Mich.2001), the Chapter 7 trustee would then administer only the debtor's undivided interest in Blackacre for purposes of the bankruptcy proceeding. This is not to say, of course, that the Chapter 7 trustee could ignore the rights of the other co-tenant. Indeed, the Chapter 7 trustee would unquestionably have to account to the co-tenant for his share of the proceeds were the Chapter 7 trustee to dispose of not only the debtor's undivided interest under Section 363(b) but also the co-tenant's undivided interest under Section 363(h). 11 U.S.C. § 363(j). However, the Chapter 7 trustee would have to account to the other co-tenant for its share of the proceeds only because he could not otherwise realize the value of the bankruptcy estate's own undivided interest in the property.

I further concluded in *Talbert* that this same reasoning applies when the debtor

---

**18.** There is also at least the suggestion in Trustee's amended complaint that Huntington may have actually received a few, relatively small payments on account of receivables deposited in a lockbox. Huntington had required that lockbox under the apparent misapprehension that CyberCo was engaged in a legitimate business that generated substantial receivables. It is unclear whether Trustee intended to also include these lockbox transfers within his fraudulent conveyance claims against Huntington. However, if that is his intention, those transfers would have also been Huntington's collateral since they represented proceeds of receivables in which Trustee acknowledges Huntington had a security interest.

owns the entire fee interest in the property but the property is also subject to a lien.

While both practitioners and the courts are accustomed to describing parties who hold liens in the property owned by a Chapter 7 debtor as "secured creditors" and the debt secured by those liens as "secured claims," these labels are misleading. A Chapter 7 trustee does not make distributions to lien holders on account of an allowed secured claim which that lien holder may have against the estate. Section 726 is quite clear that distributions by the Chapter 7 trustee are generally to be limited to only creditors having an allowed priority or non-priority unsecured claims against the estate:

\* \* \*

The visceral reaction to Section 726's clear language is that it is incorrect; that somewhere within this section or elsewhere within the Bankruptcy Code must lie a provision which provides for the allowance and payment of secured claims from property of the Chapter 7 estate. However, careful analysis of Chapter 7 reveals that the Chapter 7 trustee is not to deal with lien holders as creditors with claims against property of the estate but as competing interest holders who must be dealt with as the trustee liquidates the estate property for distribution to the debtor's unsecured creditors.

\* \* \*

Therefore, while it may be convenient to describe "property of the estate" as being all of the property at the outset of the case in which the debtor has some interest, this description is incorrect. The debtor may have outright title to many of these assets. However, it is also likely that other parties will have competing rights in at least some.

\* \* \*

What Congress has empowered the Chapter 7 trustee to do is to dispose of these assets in such a manner as to separate the property of the estate (i.e., the debtor's interest in these assets) from the competing interests in these same assets so that the Chapter 7 trustee may then distribute the property of the estate pursuant to Section 726. A Chapter 7 trustee rarely encounters a case where all of the debtor's assets are owned by the debtor free and clear. Rather, the assets are a "crude oil" consisting of the combined interests of the debtor and of other parties. The trustee, like a petroleum company, is charged with distilling from this raw mixture the debtor's interests (i.e., the property of the estate) so that it may be distributed to unsecured creditors. Lien holders and other interest holders certainly benefit from this process. However, they do not benefit because the Chapter 7 trustee has a statutory duty to distribute proceeds to them. Rather, they benefit because they are the owners of other valuable byproducts for which the trustee must account as he or she pursues the refining process.

*Id.* at 815–17.[19]

I have given this detailed explanation of *Talbert* because I see no reason why the

---

**19.** *Talbert* then explains how the Chapter 7 trustee may account to a secured creditor for its lien as he administers the bankruptcy estate's separate ownership interest in the subject property. For example, the Chapter 7 trustee would likely abandon the bankruptcy estate's interest if he were to determine that it had no value net of the applicable liens. Or the Chapter 7 trustee might sell the bankruptcy estate's interest pursuant to Section 363(b)

same logic does not apply to "interest of the debtor in property" as that phrase is also used in Section 548. If, for example, the debtor and the co-tenant had previously given their respective interests in Blackacre to A, it is logical that the bankruptcy trustee of the debtor's ensuing Chapter 7 estate would be able to avoid only the conveyance of the debtor's undivided interest. The co-tenant would still be bound by the separate gift he had made to A of his own undivided interest.

 Moreover, I do not see the logic changing if the debtor owned Blackacre in fee and the competing interest holder instead was a mortgagee. If the debtor were to have then given away to A his equity interest in Blackacre, it stands to reason that the subsequent Chapter 7 trustee would be able to avoid under Section 548(a)(1) only the equity interest the debtor had conveyed. Indeed, this point becomes even clearer when the transferee is the mortgagee itself, for if the mortgagee received a fraudulent transfer at all, it would have been only with respect to whatever remaining equity the debtor might have had in the otherwise encumbered property. Put simply, a bankruptcy trustee can avoid as fraudulent under Section 548 only that which the debtor had to transfer in the first place.

There is no question in this instance that Huntington's alleged sweeps of CyberCo's accounts resulted in huge amounts of money being transferred from CyberCo to Huntington within the year preceding CyberCo's involuntary petition. It also may be true that CyberCo intentionally allowed

Huntington to sweep these accounts so that CyberCo could continue to deceive its other creditors. Trustee, though, never alleges that Huntington received as a result of the sweeps more than what it was owed by CyberCo.[20] Moreover, by Trustee's own admission, Huntington already had a security interest in the deposit accounts subject to the sweeps. Consequently, Huntington was taking nothing more from CyberCo than its own collateral. Or, to put it differently, the sweeps did not result in any separate interest of CyberCo being transferred. Consequently, Trustee's complaint does not support his averment that the transfers subject to his Section 548 count were transfers of the debtor's interest in the subject property.

Huntington cites *Melamed v. Lake County Nat. Bank,* 727 F.2d 1399 (6th Cir.1984), in support of its contention that "diminution of the debtor's estate" is an element of any Section 548 claim and Trustee in turn does his best to distinguish that decision. *Melamed* is indeed factually similar to the case at hand. Like Huntington, the bank in *Melamed* had received a payout traceable to collateral in which the bank had a valid security interest: to wit, an account receivable. Nonetheless, the bankruptcy trustee in *Melamed,* like Trustee here, sought to recover the payment as a fraudulent transfer on the theory that the debtor had actually made the transfer in order to hinder, delay, or defraud some or all of the debtor's other creditors.

Although the details are sketchy, it appears that the *Melamed* trustee's argument paralleled what Trustee alleges in

---

and then account to the lienholder for its share of the proceeds. *Id.* at 817–18.

**20.** I recognize that the transfers Trustee challenges were much larger than the $17 million CyberCo owed to Huntington. However, nothing in Trustee's complaint suggests that Huntington kept more than what it was owed.

Rather, it appears that the difference in what Huntington received is attributable to Huntington's practice of re-advancing to CyberCo a portion of whatever had been captured by a particular sweep. *See, e.g.,* ¶¶ 58 and 80, Amended Complaint.

this instance. The debtor in *Melamed* manufactured large machines. One of the debtor's customers wanted to order a machine but was concerned about the debtor's financial condition. The customer nonetheless placed the order after the bank apparently gave it assurances concerning the debtor's viability. The customer also paid the debtor $30,000 as a down payment and it was this $30,000 that was setoff by the bank when the debtor deposited it in its account. The *Melamed* trustee apparently contended that the conveyance could be recovered from the bank as a fraudulent conveyance because the bank was aware of the debtor's financial difficulties when it gave its assurances to the customer.

The case was tried before a jury and a verdict was entered in favor of the trustee. The bank appealed on two grounds: (1) that the trustee had not established that the debtor itself had had the requisite fraudulent intent; and (2) that the transfer had not resulted "in a diminution of the debtor's assets available to creditors." *Id.* at 1402. The Sixth Circuit agreed with the bank that the trial court's instruction to the jury regarding intent was misleading and, as such, it appears that the matter could have been remanded for a new trial on that basis alone.

However, the Sixth Circuit then added that the trustee's claim should be dismissed altogether because the transfer had had no effect upon the debtor's assets in any event. As such, it made no difference whether the debtor had intended to defraud the customer or its other creditors.

> As has been noted, because of the Bank's valid security interest in accounts receivable, that transfer did not diminish the assets of the debtor which were available to its creditors. We agree with the Bank that under the circumstances of this case the $30,000

transfer had no effect on the creditors of Terminal. It did not hinder, delay or defraud them. A payment which would never have been made to Terminal without the intervention of the Bank and was subject to the Bank's security interest ended up in the Bank's hands. The other creditors of Terminal were not harmed by the transfer. This requirement for establishing a fraudulent transfer not having been met, the intent with which the transfer was made is immaterial. The district court erred in submitting the fraudulent transfer claim to the jury. Upon remand this claim will be dismissed.

*Melamed,* 727 F.2d at 1402.

Trustee's most compelling argument is to cast *Melamed* in the context of Section 548(c). That subsection states in pertinent part that:

> [A] transferee ... of such a transfer [*i.e.,* a transfer made by the debtor with the requisite intent to defraud] ... that takes for value and in good faith ... may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer....

11 U.S.C. § 548(c).

What Trustee contends is that the Sixth Circuit in *Melamed* was merely assessing whether the bank had taken the transfer in good faith and in exchange for value. Trustee concedes, of course, that Huntington may at some later stage of the proceeding be able to establish both of these criteria. However, Trustee argues that at this point in time he is entitled to at least the inference that Huntington did not act in good faith, especially given that Section 548(c) is an affirmative defense and Huntington has yet to answer the now amended complaint.

Trustee's reliance on Section 548(c) is complicated by the fact that *Melamed* was decided under the former Bankruptcy Act, and, as such, there would have been no need to reference Section 548(c). Section 548's predecessor did, though, provide similar relief under former Section 67d(6) ("A transfer made . . . which is fraudulent . . . shall be null and void . . . except as to a bona fide purchaser, lienor . . . for a present fair equivalent value."). However, I am not persuaded that the Sixth Circuit in *Melamed* reached its decision in the context of former Section 67d(6) either, for if it had, I would have expected it to have made at least some mention of that section. Moreover, I would have expected the Sixth Circuit to have discussed in more detail the actual bona fides of the bank in reaching the decision that it did.

 What I find to be more telling about *Melamed* is that former Section 67d(2)(d) is not the same as its successor, Section 548(a). Specifically, the former section, unlike Section 548(a), did not limit the recoverable conveyance to only the interest the debtor himself might have had in property conveyed; rather, former Section 67d(2) simply declared as fraudulent "every transfer made by a debtor." Consequently, it was not as apparent under the former Bankruptcy Act as it now is under the Bankruptcy Code that it is only the debtor's transfer of its own interest in property that can be avoided as a fraudulent conveyance. As such, I interpret *Melamed* as more a recognition of what was meant by "transfer" under former Section 67d(2). In other words, *Melamed* was addressing within the meaning of that former subsection what is now much clearer under Section 548(a): that a debtor can fraudulently transfer only whatever he in fact owns. Had the bank in *Melamed* not had a security interest in the debtor's account receivable, then the Sixth Circuit may have

permitted the matter to be retried with a different jury instruction regarding actual intent instead of dismissing the claim outright. Or the Sixth Circuit might have then gone on to pursue further the separate issue of whether the bank may have been a bona fide lienor for value within the exception provided by former Section 67d(6). However, the Sixth Circuit recognized intuitively within former Section 67d(2) what Section 548(a) now states explicitly: that a debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral. Or, as the Sixth Circuit in *Melamed* put it, the debtor's assets cannot be diminished if the subject property is already secured.

Trustee's citation to *In re Triple S Restaurants, Inc.,* 422 F.3d 405 (6th Cir.2005), is no more helpful to his cause. In that case, the debtor, Triple S Restaurants, had been the owner and beneficiary of a $2 million "key man" life insurance policy on Robert Harrod, one of Triple S' owners. Triple S had then assigned the policy as collateral to its lender. However, the policy itself did not remain with Triple S. Rather, Triple S transferred the policy to a trust that had been created for Harrod after Triple S began experiencing financial difficulties (the "Harrod Trust").

Triple S eventually filed for Chapter 7 relief and the bankruptcy trustee thereafter attacked the transfer as a fraudulent conveyance. Harrod had died by that time, thereby leaving $2 million in insurance proceeds to be claimed. The lender ultimately received $1.75 million under its assignment. The remaining $250,000, though, was paid to the trust as part of a settlement reached with the lender. The appeal focused on this $250,000. The appellant was Donald Heavrin. Heavrin had been sued because the Harrod Trust had distributed a significant portion of the

$250,000 to him as a beneficiary of that trust.

The bankruptcy court determined that Triple S had in fact intentionally defrauded its creditors by transferring the policy to the trust. Consequently, it avoided the transfer as fraudulent under Section 548(a)(1)(A). The district court affirmed and Heavrin appealed.[21]

The issue on appeal to the Sixth Circuit was the same as the issue presented in this case: whether property previously assigned as collateral is still capable of being fraudulently conveyed by the debtor. Heavrin insisted that the insurance proceeds that he had ultimately received never belonged to the debtor because those proceeds had been fully assigned to Triple S' lender. Therefore, he argued, Triple S' transfer of the policy could not have diminished the bankruptcy estate. *Id.* at 410.

The Sixth Circuit disagreed. However, in doing so, it did not reject Heavrin's proposition that there must be some diminution of the debtor's estate (*i.e.*, some transfer of the debtor's own interest in property). Rather, it determined instead that Triple S had a transferable interest, that being the $250,000 the lender allowed the Harrod Trust to retain. Although the panel conceded that some evidence supported Heavrin's contrary contention, it nonetheless determined that there was sufficient evidence to also support the bankruptcy court's conclusion that Triple S itself had a legitimate claim to $250,000 of the policy proceeds notwithstanding the policy's assignment to the lender. Consequently, the Sixth Circuit opined that the bankruptcy court had not erred in concluding that the transfer in question involved the debtor's property instead of the assignee's collateral.[22]

Trustee does cite a latter passage in *Triple S Restaurants* concerning the shifting of burdens of proof as support for his contention that *Triple S Restaurants* is in fact a Section 548(c) case. However, Trustee misreads that passage, for it actually addresses the shifting burden of going for-

---

21. Interestingly, the district court did not agree with the bankruptcy court that Triple S had actually intended to defraud its creditors. Rather, the district court concluded that the transfer was recoverable because it was constructively fraudulent under Section 548(a)(1)(B) (*i.e.*, the transfer had been made while debtor was insolvent and not in exchange for reasonably equivalent value). However, the Sixth Circuit ignored the intermediate court's ruling and instead evaluated Heavrin's appeal based upon the bankruptcy court's determination of actual fraud.

22. The panel in *Triple S Restaurants* did observe that a debtor's transfer of a fully encumbered asset might still be fraudulent under Section 548(a).

> Furthermore, even if the primary effect of avoidance would be to send the $250,000 back to MDFC, that money would offset TSR's outstanding debt to MDFC, thereby freeing up funds in that amount to pay the unsecured creditors. Avoiding the

$250,000 transfer, in other words, decreases the amount of secured debt and increases the Trustee's ability to pay the remaining creditors.

*Id.* at 412.

It is difficult, though, to assess how much importance the Sixth Circuit gave to this observation in rendering its decision given that the observation follows a series of other reasons why the record supported a determination that Triple S had in fact transferred property in which it had a valuable interest. Moreover, within that observation is the presumption that the creditor with the competing security interest in the collateral is oversecured or the debtor is otherwise solvent. Put differently, the observation makes sense only if the satisfaction of the creditor's debt with the subject collateral frees up either cash or other assets for distribution to the debtor's unsecured creditors. In this instance, though, Trustee alleges not only that CyberCo was insolvent, ¶ 19, Amended Complaint, but also that Huntington was "grossly undersecured." ¶ 109, Amended Complaint.

ward with evidence regarding the actual intent element in a Section 548(a)(1)(A) claim. Heavrin's explanation for why the lender had permitted the Harrod Trust to keep $250,000 of the insurance policy proceeds was that it was in settlement of the Harrod Trust's own lender liability-type claims against the assignee. Heavrin's argument on appeal was that the bankruptcy judge had erred by placing on him the burden of explaining why the Harrod Trust had a legitimate right to the $250,000 it received. According to Heavrin, it was the bankruptcy trustee, not he, who had the burden of establishing actual intent to defraud under Section 548(a)(1)(A) and that, as such, it should have been incumbent upon the bankruptcy trustee to prove why the Harrod Trust was not legitimately entitled to the $250,000.

The Sixth Circuit actually agreed with Heavrin that "a trustee attempting to avoid an allegedly fraudulent transfer normally bears the burden of proof on that issue." *Id.* at 414. However, the Sixth Circuit also observed that it was appropriate for the burden to have shifted in Heavrin's case because the bankruptcy trustee had in fact established a rebuttable presumption of actual intent by establishing several so-called "badges of fraud." (*e.g.*, that Heavrin was related to Harrod and that Heavrin was Triple S' attorney). *Id.* Shifting the burden with respect to intent under Section 548(a)(1), though, has nothing to do with the separate issue of whether the recipient of the fraudulent transfer is nonetheless protected under Section 548(c) because it gave value and it was otherwise in good faith.

It is unfortunate that the Sixth Circuit did not correlate its analysis in *Triple S Restaurants* with the specific language of Section 548(a)(1). Nonetheless, it is clear that its reasoning is consistent with both

Section 548 and *Melamed.* The question on appeal was simply whether Triple S, by transferring the fully assigned policy to the Harrod Trust, had made (1) a transfer of Triple S' interest in property; and (2) whether that transfer was made with an actual intent to defraud its creditors. The Sixth Circuit in turn concluded that Triple S had a sufficient interest in the subject policy to have transferred the requisite interest and that Heavrin had not adequately rebutted the presumption of fraud once the trustee had identified several so-called fraudulent "badges." It is certainly possible that Heavrin contended at the trial level that he was also entitled to protection under either Section 548(c) or Section 550(b) as a good faith transferee for value. However, if he did, he clearly did not appeal whatever adverse ruling he may have received regarding that argument.

To summarize, I conclude that Count II of Trustee's amended complaint does not state a cause of action under Section 548(a)(1). The amended complaint undeniably alleges that substantial amounts of money were transferred from CyberCo's accounts to Huntington within the year preceding its involuntary petition. However, the only inference that can be drawn from Trustee's amended complaint is that all of the amounts that Huntington had swept from CyberCo's accounts were already subject to its security interest. Therefore, Trustee's amended complaint cannot support a critical element to his Section 548(a)(1)(A) count: that CyberCo had transferred its interest, as opposed to Huntington's own interest, in property when the various sweeps occurred. Therefore, Count II of Trustee's amended complaint must be dismissed.

### E. *Fraudulent Conveyances With Actual Intent—Section 544(b)/*

### MFTA[23] (Amended Count III and Original Count VIII)

Count III of Trustee's amended complaint alleges that transfers by CyberCo to Huntington are also recoverable as fraudulent under Michigan's fraudulent conveyance laws. Trustee's theory for recovery under this count is the same as his theory for recovery under his Section 548(a)(1) count. Indeed, both theories appear to overlap to the extent the subject transfers occurred within the year immediately preceding CyberCo's involuntary petition. However, Count III does cast a wider net than Count II by also seeking to recover transfers by CyberCo to Huntington that occurred outside of the immediate year.[24] Trustee contends that these additional transfers may have been as much as $23,657,098.33.[25]

Trustee is permitted by Section 544(b) to utilize applicable state law to avoid fraudulent transfers. However, like Section 548(a), only transfers of the debtor's interest in property may be avoided under that section.

> (b)(1) Except as provided in paragraph (2), the trustee may avoid **any transfer of an interest of the debtor in property** ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title....

11 U.S.C. § 544(b)(1) (emphasis added).

Therefore, Trustee confronts the very same problem under Section 544(b) as he does under Section 548(a)(1).

Moreover, the outcome would not have been any different had the language of Section 544(b) itself not prevented Trustee from proceeding under state law against Huntington. Michigan, like many other states, has adopted the Uniform Fraudulent Transfer Act ("UFTA"). The UFTA's counterpart to Section 548(a)(1)(A) is not as specific as to what may be avoided. It refers simply to a "transfer" as opposed to a "transfer ... of an interest of the debtor in property."

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

MICH.COMP. LAWS. § 566.34(1)(a).

However, the UFTA eliminates whatever vagueness there might be by then excluding from the meaning of transfer "property to the extent it is encumbered by a valid lien." MICH. COMP. LAWS § 566.31(b)(i). *See also,* MICH. COMP. LAWS §§ 566.31(h), (*l*), and (m). Therefore, the UFTA incorporates the same concept as Section 548: a debtor can fraudulently transfer to another only that which the debtor actually owns. The UFTA just expresses the concept in a different way.

---

**23.** "MFTA" means "Michigan Fraudulent Transfer Act."

**24.** Trustee contends that the statute of limitations for actions brought under Michigan's fraudulent conveyance laws permits him to avoid transfers by CyberCo to Huntington made as early as six years before the December 8, 2006 commencement of this adversary proceeding.

**25.** Trustee alleges that the amount of transfers potentially avoidable within the one-year period covered by amended Count II is $45,647,604.02, whereas the amount he alleges is avoidable during the longer period covered by amended Count III is $69,304,702.35. The difference is $23,657,098.33.

Therefore, Count III of the amended complaint must be dismissed for the same reason as Count II.[26]

### F. Recovery of Avoided Transfers Under 11 U.S.C. 542 and 550 (Amended Count V and Original Count IX)

Section 547, and for that matter, Sections 548(a) and 544(b), permit only the avoidance of the transfer in question. Recovery of the transfer is a different matter. It is addressed by Section 550.

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Huntington concedes that Section 550 is a necessary adjunct to Trustee's remaining preference count and that Count V of

Trustee's amended complaint properly pleads relief under that section.[27] However, Huntington does challenge Trustee's inclusion of Section 542 as an alternative basis for recovering from Huntington the value of whatever transfers the court may ultimately avoid as preferential under Section 547.

Section 542 empowers the court to compel an entity to deliver to the bankruptcy trustee any "property that the trustee may use, sell or lease under Section 363 of this title...." 11 U.S.C. § 542(a). Section 363, in turn, provides that the bankruptcy trustee may use, sell, or lease only "property of the estate." 11 U.S.C. § 363(b)(1). Consequently, it stands to reason that Section 542 is available as a remedy only when the bankruptcy estate already has an interest in the property sought to be turned over. For example, a trustee would use Section 542 to recover a vehicle owned by the debtor but in the possession of another party.

However, avoidance actions do not in and of themselves constitute property of the estate. Rather, it is only that which is actually recovered under Section 550 on account of an avoided transfer that in fact becomes property of the estate.

---

26. Although Trustee unequivocally states that Teleservices was the source of most, if not all, of the transfers made by CyberCo to Huntington within the year immediately preceding CyberCo's demise, he is not so specific with respect to the source of whatever other transfers Huntington would have received from CyberCo between the beginning of their lending relationship in October 2002 and the beginning of December 2003. Nonetheless, it is fair to infer from what has been pled that Teleservices was CyberCo's primary source of "revenue" during the entire Huntington/CyberCo relationship. Moreover, the pleadings indicate that CyberCo serviced its debts to Huntington throughout their relationship by permitting Huntington to sweep its accounts. ¶ 30, Amended Complaint. Consequently, Cy-

berCo would have had a lien in whatever was swept from those accounts by virtue of Huntington's security interest in all of CyberCo's deposit accounts.

27. Huntington does contend, though, that Trustee's Section 550 action should be dismissed because none of the transfers he seeks to recover are avoidable. While Huntington's argument has merit with respect to Trustee's now dismissed fraudulent conveyance counts (*i.e.*, amended Counts II and III), Trustee's preference count (amended Count I) remains a viable count at this point in time. Therefore, Trustee's corollary effort to recover under Section 550 whatever may still be avoided as a preferential transfer also survives Huntington's original motion to dismiss.

[The bankruptcy] estate is comprised of all the following, . . .

\* \* \*

(3) any interest in property that the trustee recovers under . . . section 550 . . . of this title.

11 U.S.C. § 541(a)(3); *see also, Moyer v. ABN AMRO Mortgage Group, Inc. (In re Feringa),* 376 B.R. 614, 624 (Bankr. W.D.Mich.2007). Consequently, Section 542 is irrelevant for purposes of recovering avoided transfers, for it becomes operative only when the trustee already has in his possession whatever he is to recover on account of the transfer avoided.

Common sense substantiates this conclusion. Section 550 and all of the protections afforded to transferees thereunder would be rendered meaningless if the trustee could simply demand that the avoided transfer be turned over under Section 542. Indeed, one could ask why an avoidance action would even be necessary, for the broad interpretation of Section 542 advocated by Trustee would logically subsume the question of whether the transfer was avoidable as well.

Therefore, Trustee's alternative theory of recovery under Section 542 in amended Count V must be dismissed.

### G. *Avoidance of Undetected Transfers* (Amended Count VI and Original Count X)

■ The final count of Trustee's amended complaint speculates that "Huntington may have received other Transfers that may be avoidable pursuant to 11 USC 544, 547, 548, 549 and/or applicable State Law, as may be discovered by the Plaintiff during the course of these proceedings." ¶ 135, Amended Complaint. Trustee then requests relief with respect to these yet to be discovered transfers.

■. Courts are to decide only matters that are ripe for adjudication.. *Kentucky Press Ass'n, Inc. v. Kentucky,* 454 F.3d 505, 509 (6th Cir.2006); *Brown v. Ferro Corp.,* 763 F.2d 798, 801–02 (6th Cir.1985), *cert. denied,* 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). Count VI does not meet this requirement. This court cannot grant relief until Trustee is in fact in a position to pursue what at this point is only a possibility.

■ Trustee himself observes in the second sentence of paragraph 135 of his amended complaint that "[t]he Plaintiff [*i.e.,* Trustee] hereby reserves his right to amend this Complaint in accordance with the avoidance powers of the Trustee . . . to avoid any and all Transfers he has the power to avoid that become known through discovery." Trustee, of course, is doing nothing more than restating rights already afforded to him by FED.R.BANKR.P. 7015 and FED.R.CIV.P. 15(a). A separate cause of action is not necessary. Nor may it be used as a substitute device to toll an applicable statute of limitations. *See,* FED. R.CIV.P. 15(c). .

Therefore, Trustee's amended Count VI must be dismissed.

### CONCLUSION

For the reasons stated in this opinion, Huntington's original motion to dismiss is granted with respect to Counts II, III, IV and VI of Trustee's amended complaint. Huntington's original motion to dismiss is also granted with respect to the Section 542 relief requested in Count V. Consequently, only Count I and the Section 550 portion of Count V of Trustee's amended complaint remain for further adjudication.

As for Huntington's amended motion to dismiss, it is denied for the reasons also

 

stated in this opinion. However, denial is without prejudice to Huntington filing a subsequent motion to dismiss under Rule 12(c) once Huntington has answered Trustee's amended complaint.

The court will enter separate orders consistent with this opinion.